UNITED STATES of America,

v.

Joseph MANNINO, Defendant.

No. 81 Cr. 163 (MJL).

United States District Court, S.D. New York.

March 4, 1982.

John S. Martin, Jr., U.S. Atty. for the S.D.N.Y., New York City by Richard A. Mescon, Asst. U.S. Atty., New York City, for United States of America.

Carro, Spanbock Londin Fass & Geller, New York City by Jerome J. Londin, Jean D. Thompson, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

LOWE, District Judge.

An indictment has been returned against defendant Joseph Mannino ("Mannino") charging him with the crimes of conspiracy (18 U.S.C. § 371); false statements (18 U.S.C. §§ 1014 and 2); mail fraud (18 U.S.C. §§ 1341 and 2); and transportation of stolen property (18 U.S.C. §§ 2314 and 2). The indictment alleges that defendant, an officer of Compratt Construction Corporation ("Compratt") and Luman Equipment Corporation ("Luman"), acting with one Lucera and others, caused the corporations to issue false vendor invoices which were presented to various banks in order to obtain lease financing.

Defendant has moved this Court to suppress: (1) statements he is alleged to have made to FBI agents on or about November 1, 1978; (2) documents he turned over to the government; and (3) statements he is alleged to have made to an Assistant United States Attorney on October 30, 1979. The government opposes the motion.

### Background

For three years the government had been investigating OEM Capital Corp. ("OEM"), a corporation engaged in arranging lease financing for companies that wanted to finance the purchase of equipment.[1] The indictment alleges that Compratt and Luman provided false vendor invoices to OEM which were used in support of applications to various banks for lease financing. In late October, 1978, FBI Agent Donald Johnson called Mannino and Lucera to arrange an appointment to discuss OEM and Herbert Wolf.[2] Agent Johnson, his partner, FBI Agent Mitchell, Mannino and Lucera met on November 1, 1978 at the Compratt offices in Connecticut.

1. A potential lessee would make application to OEM for the lease of specified equipment. OEM would purchase the equipment then lease it to the applicant. OEM would then assign the lease to a bank and the lessee paid the rent directly to the bank.

2. Wolf, the controlling officer and stockholder of Bedford Leasing Corp., was an alleged participant in the conspiracy under investigation.

### Immunity Claim

Agent Johnson testified that after he introduced himself and his partner, Lucera asked whether he and Mannino were targets of the investigation. Johnson said "No." Lucera then asked if they were in any trouble. Johnson replied: "You tell me." Johnson asked for and Mannino gave him blank stationery of Compratt and Luman.[3] Mannino said he had contracted for a construction job for a company, Hattie Carnegie, and that Herbert Wolf had assisted him in seeking financing. Mannino made other incriminating statements.

Mannino testified that after Johnson told him that the agents were investigating OEM, he asked how he could help them. Johnson said that he was looking for Mannino's cooperation. When asked by Mannino if he and Lucera were involved, Johnson replied that they were not targets and were not being investigated, nor were they going to be indicted. The conversation with the agents continued for two or three hours.

Defendant Mannino argues that the statements made and documents turned over to the government were the product of a promise by Agent Johnson of immunity. The government contends that, even if Mannino's version of the events is accepted by the Court, Agent Johnson's conduct does not amount to a grant of immunity.

The Fifth Amendment to the United States Constitution prohibits the use as evidence against a person in a subsequent criminal proceeding statements made or evidence disclosed by the defendant as a result of compulsion. The term compulsion, in Fifth Amendment analysis, has been held to include evidence induced under a govern-

Agent Johnson testified that he told Lucera and Mannino that in the course of his investigation the names of Compratt and Luman had come up and that he wanted to discuss the matter with them.

3. Mannino and Lucera made arrangements to turn over books and records of their two companies later. These records were received by the government in May of 1979.

mental promise of immunity. *Shotwell Manufacturing Co. v. United States,* 371 U.S. 341, 347, 83 S.Ct. 448, 453, 9 L.Ed.2d 357 (1963). The inquiry in this case is whether Agent Johnson's statements amounted to a promise of immunity.

Mannino cites *United States v. Denno,* 259 F.Supp. 784 (S.D.N.Y.1966) in support of his immunity claim. However, *Denno* is clearly distinguishable. Judge Weinfeld in deciding *Denno* found that detective Pickett told petitioner Caserino that the prosecution wanted and needed his help, and that it:

> 'wanted his statement only as a witness' . . . that 'no charges would be brought against him,' and that 'you will never go to trial in this case'.

*Id.* at 790. Judge Weinfeld further found that those promises were reasonably understood by petitioner as an assurance in exchange for his statements.

 The record in this case does not support such a finding. The credible evidence, on the hearing, supports the conclusion that Mannino was told that he was not a target of the investigation, and that the agent wanted his help. The Court further finds that Agent Johnson did not tell Mannino he would not be indicted and did not use trickery or deception to secure Mannino's cooperation. On November 1, 1978, the investigation of the lease financing fraud was ongoing and the focus of the investigation was OEM and its officers. There was no misstatement or concealment of fact as found in *United States, ex rel. Everett v. Murphy,* 329 F.2d 68, 70 (2d Cir.), *cert. denied,* 377 U.S. 967, 84 S.Ct. 1648, 12 L.Ed.2d 737 (1964). Nor had custody attached such as to trigger advice of "Rights," *Miranda v. Arizona,* 384 U.S. 436, 444, 478, 86 S.Ct. 1602, 1612, 1629–30, 16 L.Ed.2d 694 (1966).

For the above reasons the defendant's motion to suppress statements made on November 1, 1978 and documents given to the government at that time and subsequent thereto is in all respects denied.

## Rule 11(e)(6)(D) Claim

Mannino alleges that on October 30th, 1979 he, Lucera and their attorneys met with Assistant United States Attorney Richard A. Mescon for the purpose of plea negotiations. Therefore, any statements made by him during that conference, he claims, are inadmissible at his trial under 11(e)(6)(D) of the Federal Rules of Criminal Procedure. The government contends that the October 30th conference did not constitute a plea negotiation within the meaning of Rule 11(e)(6)(D) and that Mannino's statements are therefore admissible.

Mannino's attorney Jennings testified that in a telephone conversation with FBI Agent Price on May 25, 1979, he was told that the person with whom he was to discuss the possibility of his client's testifying under a grant of immunity was Mr. Johnson of the FBI or the Assistant U.S. Attorney. Jennings spoke with Assistant U.S. Attorney Mescon by telephone on May 29, 1979. Jennings arranged a June 1st meeting at Mescon's office for Mannino, himself and Mescon.

The following day, Mescon telephoned Jennings to postpone the meeting and told him that Mannino and Lucera had incriminated themselves during their meeting with the FBI agents in Danbury in November 1978. According to Jennings, Mescon said: "[Y]our clients may have some exposure . . . ."[4] "Their previous confession amounts to aiding and abetting false loan applications." "The cat may be out of the bag . . . ."[5] Jennings reported that Mescon said Mannino and Lucera "may have some value as possible witnesses" and therefore that, " 'I will still talk to you.' "[6] However, because Mannino and Lucera now " 'may have some exposure,' . . . our [the U.S. Attorney's office] inclination is probably that

---

4. *See* Transcript of Hearing, dated May 5, 1981, at 83 [hereinafter cited as T1 ___.].

5. T1 84.

6. *Id.* at 85.

we would want some sort of plea." [7] The plea that was to be discussed was still vague and subject to negotiation because, according to Jennings, Mescon only "mentioned that he would want one count of something...." [8] At that early stage, Jennings testified that he had not yet discussed "how many counts or what the possible crime would be...." [9]

On June 4, 1979 Jennings met with Mescon and Johnson. Mescon decided that Mannino and Lucera should not be present. Jennings testified that he went to the meeting to negotiate a plea. He informed Mescon that he knew he was going to make certain statements which were factual in nature and wanted to set the ground rules, that his statements were made in a spirit of negotiation and could not be used against his clients.

Jennings was succeeded by local counsel in New York City: Gerald Feldman as attorney for Mannino, and Arthur B. Kramer as counsel for Lucera. On the first day of hearings, Kramer testified that prior to the October 30, 1979 meeting with Mescon, see page 15, supra, he was constantly suggesting to Mescon that a deal could be made under which Mannino would be indicted and plead guilty, and Lucera would be granted immunity and testify for the government.[10] However, in testimony given on the second day of hearings, Kramer stated that he had no present recollection that Mannino's name was ever mentioned by either himself or Mescon in the context of a plea of guilty, prior to the October 30th date, either when he had face-to-face discussions with Mescon [11] or over the telephone.[12]

7. *Id.*

8. *Id.*

9. *Id.* at 86.

10. For example:
 Q During these telephone conversations which preceded the October 30th meeting, did Mr. Mescon suggest that a deal could be made under which Mannino alone would be indicted and plead guilty and that Lucera would not be indicted?
 A No. I was constantly suggesting that to him as something that my client might well be interested in exploring with the government, but Mr. Mescon never, prior to October 30th, indicated any willingness on the government's part to entertain such a resolution.
 T1 108.
 THE COURT: You have testified that you were constantly asking Mr. Mescon if the other defendant, this one on trial, could plead guilty and your client not be indicted, or however you put it, be let off the hook. Is that correct, or words to that effect? If you don't recall, you phrase it in your language. What was it you had constantly been asking Mr. Mescon prior to this day concerning your client?
 THE WITNESS: Whether at that stage in the proceedings he would entertain the notion that my client not be indicted in return for his cooperation and in return for Mr. Mannino's agreement to plead guilty.
 T1 111.

11. *See* Transcript of Hearings, dated May 6, 1981 [hereinafter cited as T2 ____.]
 Q Prior to that October 30th meeting in Mr. Mescon's office, on those occasions when you went down to meet him in the U.S. Attorney's office, is it your testimony that on each occasion you went down to ask for immunity and there was no other discussion?
 A No, that is not my testimony. We had all kinds of other discussions, pleasantries, this and that. Mr. Johnson was there, we exchanged old war stories.
 Q Other than general chit-chat of that nature, let me focus on something very precise. During those occasions when you went down to see Mr. Mescon in his office did Mr. Mannino's name come up?
 A I am sure it did. I have no specific recollection of it.
 Q Did Mr. Mannino's name come up in the context of a plea of guilty?
 A I have no recollection of that subject ever being discussed until well after the October 30th meeting.
 T2 147.

12. Q Let's go to the telephone conversations. Apart from the several occasions when you came down to see Mr. Mescon in person prior to the October 30th meeting, you say you had several conversations with him on the telephone?
 A Yes.
 Q What was the subject of those conversations?
 A Again, exploring the possibility of obtaining immunity for my client.
 Q During any of those telephone conversations did the subject of Mr. Mannino's pleading guilty come up?
 A No. To the best of my recollection, it didn't come up in any conversation.

Mannino testified that before the October 30th meeting he met Kramer four times in Kramer's office. The first such meeting was in early July when Lucera retained Kramer. Mannino testified that on August 8, 1979, he, Lucera, Kramer, and Feldman met again in Kramer's office. Kramer and Feldman told him that they had previously met Mescon (either jointly or separately). According to Mannino, Kramer said that Mannino and Lucera could make a deal whereby Mannino would plead guilty to certain charges—which would have to be discussed at a later date—and Mannino would testify against Wolf and OEM, and Lucera would agree to testify and cooperate in exchange for immunity for Lucera, Compratt and Lumen. Mannino and Lucera asked the attorneys to set up a meeting so that they could discuss with Mescon the immunity, and, if not the immunity, then the plea of guilty with all the other terms that Kramer had stated. Kramer's response was that there was no way the government would even consider immunity, and that they should set up a meeting to discuss a plea [by Mannino].

On more than one occasion before the October 30th meeting, Mannino testified, Kramer told Mannino that, based upon the information Mannino and Lucera had given him with respect to the November 1, 1978

meeting with the FBI and the documents Mannino had given the FBI on May 23 or May 24, 1979, Mannino's chances at trial were a thousand to one and that the best thing to do was to take the deal that Kramer had presented to him.

Mannino further testified that the day of the October 30th meeting, Mannino, Lucera, Kramer and Feldman met in Feldman's office. Feldman set out the agenda for the meeting with Mescon. First, Feldman would discuss the reasons why Mannino and Lucera should be granted immunity. If the government would not accept the plea for immunity, they would discuss the deal whereby Mannino would plead guilty and the charges as to which he would have to plead. Kramer's response was that it was a waste of time to discuss immunity and that they should begin by stating that they were prepared to accept the deal and then inquire as to what the specific charges Mannino would be required to plead.

Defendant Mannino argues that the conference which took place on October 30th with Mescon was a plea negotiation with an attorney for the government, and that any statements made by him are inadmissible under Rule 11(e)(6)(D).[13] The government argues that although Rule 11(e)(6)(D) would otherwise govern the question of admissibility of Mannino's October 30th statements,

Q His name didn't come up?
A Not during the telephone conversations.
Q Then is it fair to state that your best recollection is you had approximately six conversations with Mr. Mescon—I am taking several in person and several on the telephone—before the October 30th meeting during each of which you tried to get immunity for Mr. Lucera, and that was the purpose of your calling and that was the subject matter of those conversations?
A That is a fair summary.
Q And that in none of those was there any discussion about Mr. Mannino's pleading guilty?
A That's correct.
T2 147–49.

**13.** The full text of Rule 11(e)(6) as amended April 1979, effective December 1980, is as follows:

*(6) Inadmissibility of Pleas, Plea Discussions, and Related Statements.* Except as otherwise provided in this paragraph, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant

who made the plea or was a participant in the plea discussions:
(A) a plea of guilty which was later withdrawn;
(B) a plea of nolo contendere;
(C) any statement made in the course of any proceedings under this rule regarding either of the foregoing pleas; or
(D) any statement made in the course of plea discussions with an attorney for the government which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.
However, such a statement is admissible (i) in any proceeding wherein another statement made in the course of the same plea or plea discussions has been introduced and the statement ought in fairness be considered contemporaneously with it, or (ii) in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record, and in the presence of counsel.

the Rule is inapplicable because the conference with Assistant U.S. Attorney Mescon was not a "plea discussion." The defendant's purpose, the government contends, was to convince the government not to indict either suspect. It was:

> a last ditch effort by counsel for Mannino and Lucera to persuade the government that they should not be indicted at all.

The government further contends that the parties at the October 30th conference did not seek to obtain concessions in return for an offer to plead guilty.

This Court finds defendant's position persuasive.

Subdivision (D) of Rule 11(e)(6) addresses "any statement made in the course of plea discussions with an attorney for the government which do not result in a plea of guilty...."[14] Prior to the amendment of Rule 11(e)(6)(D) in December 1981, the Fifth Circuit Court of Appeals in *United States v. Robertson,* 582 F.2d 1356, 1364–68 (5th Cir.1978) set forth a two-tiered test to determine whether the statements made by a defendant were in fact and in law the product of plea negotiations.[15] As the Fifth Circuit explained:

> To determine whether a discussion should be characterized as a plea negotiation and as inadmissible, the trial court should carefully consider the totality of the circumstances. Thus, each case must turn on its own facts.

> \* \* \* \* \* \*

The trial court must apply a two-tiered analysis and determine, first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable given the totality of the objective circumstances.

*Id.* at 1366.

Although this Circuit has not adopted the two-tiered analysis of *Robertson,* in cases in which it has considered Rule 11(e)(6)(D) the Circuit has focused upon the *Robertson* factors, *i.e.,* whether the defendant in fact believed he was negotiating a plea at the time of the admissions and whether the expectation was reasonable. In *United States v. Levy,* 578 F.2d 896, 901 (2d Cir. 1978), the Court stated:

> Plea bargaining implies an offer to plead guilty upon condition. The offer by the defendant must, in some way, express the hope that a concession to reduce the punishment will come to pass. A silent hope, if uncommunicated, gives the officer or prosecutor no chance to reject a confession he did not seek. A contrary rule would permit the accused to grant retrospectively to himself what is akin to use immunity.

The Court further explained:

> On the other hand, the purpose of Rule 11(e)(6) should not be forgotten. The purpose is to encourage plea bargaining,

---

**14.** The Advisory Committee's Note on Rule 410 of the Federal Rules of Evidence, as amended in 1980, which accompanies the equivalent amendment to Rule 11(e)(6), states in relevant part:

> The 'in the course of or as a consequence of such pleas or plea discussions' language of the amendment identifies with more precision than the present language the necessary relationship between the statements and the plea or discussion. See the dispute between the majority and concurring opinion in *United States v. Herman,* 544 F.2d 791 (5th Cir. 1977), concerning the meanings and effect of the phrases 'connection to' and 'relevant to' in the present rule. Moreover, by relating the statements to 'plea discussions' rather than 'an offer to plead,' the amendment ensures 'that even an attempt to open plea bargaining [is] covered under the same rule

of inadmissibility.' *United States v. Brooks,* 536 F.2d 1137 (6th Cir.1976).

> The last sentence of Rule 11(e)(6) is amended to provide a second exception to the general rule of nonadmissibility of the described statements. Under the amendment, such a statement is also admissible 'in any proceeding wherein another statement made in the course of the same plea or plea discussions has been introduced and the statement ought in fairness be considered contemporaneously with it.'

*Weinstein's Evidence* ¶ 140(6) (1981).

**15.** The 1981 Amendment to Rule 11(e)(6)(D) restricted the applicability of the Rule to plea negotiations *with the attorney for the government.* Although *Robertson* was decided prior to this limitation, its analysis of the term "plea negotiation" is instructive.

a system thought by many, though others disagree, to be desirable. We recognize that in the light of *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), care must be taken lest roadblocks be set in the way of easy access to the system. We think that the purpose can best be served if the accused is required, at least, to make manifest his intention to seek a plea bargain before he takes the route of self-incrimination. *See Hutto v. Ross,* 429 U.S. 28, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976).

We need not decide, on this appeal, whether or in what circumstances, admissions by a defendant will be suppressed when they are part of a *de facto* process of plea bargaining even though it is less than formal. *Cf. United States v. Herman,* 544 F.2d 791 (5th Cir.1977) (statement to postal inspectors); and *cf. United States v. Smith,* 525 F.2d 1017, 1021 (10th Cir.1975) (to policemen). For Levy made his offers of cooperation and attendant admissions without attaching any condition to his admissions.

*Id.*

The record amply supports a finding that Mannino's former counsel, Jennings, informed the Assistant U.S. Attorney that he was initiating plea discussions on behalf of Mannino.[16] After attorney Feldman substituted as counsel for Mannino, the Court finds that Mannino, during the course of many conversations with the defense lawyers and Lucera, believed he was discussing an appropriate plea offer. The Court further finds that Mescon, after being put on notice by Jennings that Mannino was attempting to negotiate a plea, did not reject the prospect but continued negotiations with the attorneys from June 4, 1979 until sometime after the October 30th meeting, when he accepted Lucera's offer to testify for the government in exchange for not being indicted.

The Court does not credit the testimony of Mr. Kramer on the second day of hearings, not only because it is totally inconsistent with his prior testimony (*see* note 4, *supra*), but because the prior testimony is consistent with: (1) a memorandum he made after the October 30th conference;[17] (2) other testimony he gave concerning the meeting;[18] (3) events subsequent to October 30th;[19] and (4) reasonable inferences

---

**16.** When asked about the conversations with Mescon, Jennings testified:

> A [M]y statements were made [to Mescon] in a spirit of negotiation and could not be used against my clients.

T1 91.

**17.** *See* Government's Exhibit 3:

> 'Our meeting had been preceded by several telephone calls in which Mescon suggested that I come in alone with Lucera, the suggestion being that a deal could be made under which Mannino alone would be indicted and plead and Lucera would not be indicted.'

*See* T1 113. And:

> 'I think both'—that is Mannino and Lucera—'would be good witnesses in the current proceedings against OEM and Wolf. I think Mescon thought so too.'

*Id.* at 144.

**18.** Kramer testified that one of the discussions at the October 30th meeting

> was the offer that our clients would testify to everything they knew about the people with whom they dealt, the nature of the transactions.

THE COURT: Testify where?

THE WITNESS: Testify in the grand jury and testify in the case against the major actors in this conspiracy.

T1 129–30. In response to the question, did Mr. Mescon ask for the client's testimony? Kramer replied:

> A He didn't ask. We volunteered it. He didn't seem to think at that point that it was a particularly critical part of his case....

Shortly after this testimony the witness testified that Mescon did not ask for the client's testimony at the October 30th meeting.

**19.** Q By the way, did you eventually work out some sort of arrangement for Mr. Lucera?

A Eventually I did, yes.

Q What was that arrangement?

A In substance, in return for his agreement to testify fully concerning his knowledge of the facts in any investigation or proceedings that the government might initiate or in any trial, in any case that was then pending, that he would not be prosecuted so long as his own testimony was truthful.

T2 149.

that may be drawn from the testimony of Agent Johnson.[20]

■ The Court finds upon all of the credible evidence that Mannino engaged in the October 30th conference with Assistant U.S. Attorney Mescon for the purpose of securing a concession from the government that he not be indicted, and if that offer was refused, that he enter an acceptable plea in exchange for his testimony and that of his partner Lucera. The Court therefore finds that statements made by Mannino during the October 30th conference were made during plea bargaining with an attorney for the government and are inadmissible against him on trial unless he waived the protection of Rule 11(e)(6)(D).

### Waiver

The government argues that even if the statements made by Mannino are within Rule 11(e)(6)(D) they are nevertheless admissible against the defendant at trial because Mannino waived the protection of the Rule. The defendant argues that the record does not support any finding of waiver.

Kramer testified that at a strategy meeting on October 30th, the four participants (Kramer, Feldman, Lucera and Mannino) had agreed that Lucera and Mannino would throw themselves on the mercy of the government in an open fashion that would be completely on the record. He also testified that Feldman, at the outset of the meeting in Mescon's office, stated that the meeting was on the record and that the clients had nothing to withhold. Kramer's contemporaneous memorandum (Ex. 3)

states that the conference was on the record. Agent Johnson testified that Mescon said the meeting would be "on the record" and that Feldman and Kramer agreed.

Mannino testified that at the meeting in Feldman's office prior to the conference with Mescon, Feldman said the Mescon conference "was to be completely off the record" and that he, Mannino, understood that to mean "whatever we said couldn't be held against us."[21] He further testified that at the meeting with Mescon, none of the participants made any statement whether the meeting was to be on or off the record. Mannino testified that Rule 11 was not mentioned in words or substance nor did anyone ask him, Mannino, whether he waived his rights under Rule 11. He stated that he did not agree, in words or substance, that what he said at the October 30th meeting could be used against him.

The appropriate standard to be applied to a claim of waiver of inadmissibility of statements made during a plea negotiation is either the traditional voluntariness standard based on the totality of circumstances[22] or the "knowing and intelligent waiver" standard.[23] The proper choice requires an examination of the policy considerations sought to be effectuated by Rule 11(e)(6)(D).

Mr. Justice Stewart explained in *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) that the much more stringent "knowing and intelligent waiver" standard

**20.** Agent Johnson testified that a month or two after the October 30th meeting, Kramer brought to Mescon the suggestion that Mannino would plead guilty and Lucera would not be indicted. T2 228–29. When asked whether this suggestion just came out of the blue, Johnson testified: "We may have contacted Mr. Kramer to ask him, you know, would he be interested." *Id.* at 229. Johnson was then asked how long before Kramer's offer of Mannino in exchange for Lucera, the Government had asked Kramer whether he would be interested in such an arrangement, thus precipitating Kramer's offer of a guilty plea by Mannino. Johnson answered: "I know it had to be a period of months, Sir." *Id.* at 230.

**21.** T2 251.

**22.** The Supreme Court has asked, in the context of a confession under police questioning: "Is the confession the product of an essentially free and unconstrained choice by its maker?" *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

**23.** Is the act "an intentional relinquishment or abandonment of a known right or privilege?" *Johnson v. Zerbest,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

was articulated in a case involving the validity of a defendant's decision to forgo a right constitutionally guaranteed to protect a fair trial and the reliability of the truth-determining process. *Id.* at 236, 93 S.Ct. at 2052. He distinguished the voluntariness standard as one which is applied to the waiver of those rights which have nothing to do with promoting the fair ascertainment of truth at trial or the integrity of the fact finding process.[24] In such circumstances, the Court held that, in order to "preserve the fairness of the trial process," a heavy burden would be placed on the government before waiver could be found. *Id.* The "knowing and intelligent waiver" test was limited by the Court, however, "to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial." *Id.* at 237, 93 S.Ct. at 2052–53 (footnote omitted). Such rights include the right to counsel, the right to confrontation, the right to a jury trial, and the right to be free from double jeopardy. Significantly, the Court observed that guilty pleas "have been carefully scrutinized to determine whether the accused knew and understood all the rights to which he would be entitled at trial, and that he had intentionally chosen to forgo them. *Id.* at 238, 93 S.Ct. at 2053.

Although the rule of inadmissibility contained in Rule 11(e)(6)(D) is of congressional rather than constitutional origin, Mr. Justice Stewart's analysis of guilty pleas may be applied with the same cogency to determine the standard for waiver applicable to the instant case. Plea bargaining under Rule 11(e)(6)(D) is essentially an offer by the accused to enter into a compromise with the government, whereby his liability or punishment for admittedly criminal conduct will be diminished in exchange for informa-

tion which leads to the prosecution and conviction of others.[25] As a pre-condition of the plea bargain, the accused is required to be truthful about his own complicity—i.e. to acknowledge his guilt. In order to encourage the fruitful exchange of information, the rule protects the accused from the admissibility, on trial, of his statements during plea bargaining. If the promise of inadmissibility were not expressly guaranteed, the process would have little efficacy because the plea bargaining admissions would make a subsequent trial little more than an inquest.

For this reason, waiver of inadmissibility in the plea bargaining context is closely analogous to waiver in the context of a guilty plea. Therefore this Court finds that plea bargaining waiver claims should be governed by the same standard—the intentional relinquishment or abandonment of a known right. The burden is upon the government to establish waiver. *Schneckloth v. Bustamonte, supra* at 236, 93 S.Ct. at 2052.

The evidence at the hearing was in conflict as to whether the attorneys said the October 30th meeting was "on the record" or "off the record." Even if this Court finds that the attorneys present stated that the meeting was "on the record," such a finding is not dispositive of the issue herein. The government stipulated at the hearing that it would not offer any testimony that Mannino said anything about waiving his rights. Therefore, this Court must find that Mannino made no express waiver.

The Court recognizes that, under some circumstances, an accused may by conduct waive a right. However, the government's burden is great, and the Court must

---

**24.** By way of example, Mr. Justice Stewart contrasted the Fourth Amendment right of an individual to be left alone—having nothing to do with the ascertainment of truth—and the Sixth Amendment rights of counsel and confrontation, which go to the integrity of the fact finding process.

**25.** In *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) the Supreme Court recognized and approved plea bargaining

as an essential component of the criminal justice system. Rule 11(e)(6)(D), as amended, is the congressional response to *Santobello,* mandating that the plea bargaining process be formalized. Plea bargaining may only take place with an attorney for the government. *See* Subcomm. on Criminal Justice of the House Comm. on the Judiciary, H.R.Doc. No. 96–1302, 96th Cong., 2d Sess. (1980).

presume that a defendant did not waive his rights. *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). We must consider whether, under the particular facts and circumstances of this case, including the background, experience and conduct of Mannino, Mannino knew that his statements were to be used against him at trial, and with this knowledge inculpated himself.

The record shows that Mannino had never before been in conflict with the law. Over a course of months, prior to October 30th, beginning with Attorney Jennings, Mannino sought to plea bargain in hope of avoiding indictment or, at worst, of pleading guilty to something in order to avoid trial. Although Mannino testified that he knew the meaning of the phrase "on the record," he did not hear any of the attorneys at the October 30th meeting use that phrase. This Court is persuaded on this record, that the government has not proven that Mannino knowingly and intelligently waived the right of inadmissibility of plea bargaining statements contained in Rule 11(e)(6)(D). The motion to suppress the defendant's statements made to the government attorney at the October 30th plea bargaining conference therefore is granted.

## CONCLUSION

Defendant's motion to suppress statements he allegedly made to FBI agents on or about November 1, 1978, and the documents he turned over to the government at that time, is denied. The motion to suppress statements made to Assistant U.S. Attorney Mescon on October 30, 1979 is granted.

It Is So Ordered.