**UNITED STATES of America, et al., Plaintiff,**

v.

**James H. BOLTZ, Defendant.**

No. F87–011 CR.

United States District Court, D. Alaska.

July 1, 1987.

---

Stephen Cooper, Asst. U.S. Atty., Fairbanks, Alaska, for plaintiff.

Winston S. Burbank, Call, Barrett & Burbank, Fairbanks, Alaska, for defendant.

## DECISION MOTION TO SUPPRESS

KLEINFELD, District Judge.

Defendant moves to suppress evidence of the statements he made in an interview February 26, 1987.

### FINDINGS OF FACT

Defendant Boltz testified at an evidentiary hearing. Based upon the testimony and the affidavits filed, the court finds as follows:

1. An Alaska State Trooper, Sgt. Mayberry, telephoned defendant Boltz at approximately 4:45 P.M. February 26, 1987. He told Mr. Boltz that if Mr. Boltz did not come down to the state trooper's office in Fairbanks by 5:00 P.M., charges would be filed against him. Mr. Boltz responded that he could not drive the distance from his home in North Pole, about 15 miles south of Fairbanks, that fast. Trooper Mayberry responded that they would wait until 5:30 P.M. Mr. Boltz drove to Trooper Mayberry's office, and met with Trooper Mayberry, Assistant District Attorney Jeffrey O'Bryant, and Assistant United States Attorney Stephen Cooper.

2. Mr. O'Bryant states in his affidavit that at the beginning of the meeting, he gave Mr. Boltz a *Miranda* warning, and further advised Mr. Boltz that "the purpose of the meeting was not to have defendant say anything, but only for him to listen and to consider any offer that might be made." Mr. O'Bryant states that he specifically told defendant not to talk.

Mr. Boltz testified that he does not recall being told not to talk, and does not believe that he was advised of his right to remain silent, though he felt he could remain silent.

The court finds that Mr. Boltz was advised of his *Miranda* rights, including his right to remain silent, and was told that "the purpose of the meeting was not to have defendant say anything, but only for him to listen and to consider any offer that might be made." The shock and unpleasantness of walking into a room with so much power aligned against him would make Mr. Boltz's memory less reliable on this matter, and Mr. O'Bryant's affidavit is accepted as correct on this point.

3. Mr. Boltz says in his affidavit that Mr. O'Bryant said the conversation would not be recorded, and the purpose was to see if he would cooperate with them and testify against others who would be charged with various fish and wildlife violations. Mr. Boltz testified at the hearing that a tape recorder was in the room but was not turned on. He asked for an understanding that the conversation would be off the record. Mr. O'Bryant pushed the tape recorder towards Mr. Boltz so that Mr. Boltz could verify that it was turned off and that they were not on the record. The government has offered no evidence to contradict these representations, and the court finds that they are correct. Regardless of whether Mr. Boltz waived his Fifth Amendment right to remain silent, this episode with the tape recorder manifests an intent not to waive his right to preserve Rule 11 confidentiality of the discussion.

4. At the meeting, according to the affidavit and testimony of Mr. Boltz, supported in part by Mr. O'Bryant's affidavit and not contradicted by any government evidence, the officials showed him a number of slides, and discussed with him "full immunity," a "token civil fine" of approximately $1,200, and forfeiture of a wolf and a fox hide, in return for his testimony. The court finds these representations to be correct.

5. No criminal charges had been filed against Mr. Boltz at the time of the meeting.

6. At the February 26, 1987 meeting at the Public Safety Building, according to the government's "Response to Discovery Request," Mr. Boltz made the following statements:

"You're looking at me for a fox and a wolf." He said it seemed as though the authorities were making more out of it than it warranted. He also said that when he brought the wolf hide to be sealed, the sealing official gave no indication that there was any problem about the legality of the hide.

Boltz was shown the slides taken on March 27, 1986, and he confirmed that he was on that airborne hunt and was depicted on the film. He acknowledged that he shot a wolf and asserted that was the only wolf he ever shot; that he only wanted one wolf, just to hang it on the wall; that he had only ever taken one sheep and only wanted one, and had been on sheep hunts since but did not even carry a rifle.

Sgt. Mayberry asked Boltz if he still had that wolf hide. Boltz said yes. When asked where it was, he refused to say.

For purposes of this motion, it is assumed that Boltz made the statements attributed to him by the government.

7. The day after the meeting, the Assistant United States Attorney sent Mr. Boltz a letter, produced at the evidentiary hearing, stating the following:

Enclosed for your reference is a copy of the Information setting forth potential federal charges against you for your aerial wolf and fox kills.

This office plans to file this Information in United States District Court in Fairbanks, at 4:00 p.m. on Wednesday, March 4, 1987, in the absence of any contact with you before then. Please feel free to contact this office in person or by telephone at 456-0245.

Two weeks later, on March 13, 1987, the Assistant United States Attorney sent another letter to Mr. Boltz, stating in part the following:

This office has evidence that you have recently possessed a wolf hide that is subject to seizure ... and that you have removed the hide in order to prevent its seizure.

The evidence also indicates that you were advised verbally on February 26, 1987 and again by letter of 2/27 (which was hand delivered on 2/28), that federal charges were about to be filed against you for shooting the wolf while you were airborne, and that on February 26 you acknowledged you were then still in possession of the hide.

[explanation of possible felony offense]

It would be in your interest to contact this office as soon as possible about this matter, in order to make possible a disposition not involving your prosecution under § 2232. In the absence of such contact from you by 12:00 o'clock noon, on Wednesday, March 18, 1987, this office will proceed to investigate and present this case to the federal grand jury and seek a felony indictment of you.....

## ANALYSIS

Boltz argues that Rule 11(e)(6)(D) of the Federal Rules of Criminal Procedure entitles him to suppression of the statements. That rule says:

> Except as otherwise provided in this paragraph, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:
>
> .   .   .   .   .
>
> (D) any statement made in the course of plea discussions with an attorney for the government which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

The Advisory Committee notes state that this rule is taken from Rule 410 of the Rules of Evidence and refers to the notes there. The Advisory Committee notes on Evidence Rule 410 state that "As with compromise offers generally ... free communication is needed, and security against having an offer of compromise or related statement admitted in evidence effectively encourages it."

The Advisory Committee Notes regarding the 1979 amendments to the rule explain that subdivision (e)(6) "was intended to encourage such discussions" between the attorney for the government and the defense attorney or defendant pro se "with a view toward reaching a plea agreement." These Notes go on to distinguish between statements to government attorneys and statements to other government agents:

> It thus fully protects the plea discussion process authorized by Rule 11 without attempting to deal with confrontations between suspects and law enforcement agents, which involve problems of quite different dimensions.... This change, it must be emphasized, does not compel the conclusion conclusion that statements made to law enforcement agents, especially when the agents purport to have authority to bargain, are inevitably admissible. Rather, the point is that such cases are not covered by the per se rule of 11(e)(6) and thus must be resolved by that body of law dealing with police interrogations.

Boltz argues that the discussion was of the sort contemplated by the rule. The government argues that the rule does not apply, because no criminal case had yet been filed against Mr. Boltz, and no plea of guilty or nolo contendere was contemplated, but rather "total immunity." The government relies upon the language in another subdivision of the rule; Rule 11(e)(1) provides:

> The attorney for the government and the attorney for the defendant or the defendant when acting pro se may engage in discussions with a view toward reaching an agreement that, upon entering a plea of guilty or nolo contendere to a charged offense or to a lesser or related offense, the attorney for the government will do any of the following ... [move for dismissal of other charges, recommend or not oppose a defense request regarding sentencing, or agree upon a specific sentence].

The government argument assumes that the phrase "plea discussions" in subsection (6) is limited to discussions relating to a plea to a charged or lesser or related offense as discussed in subsection (1).

Neither side has cited Ninth Circuit authority. Both cite distinguishable cases from other circuits. The Ninth Circuit in *United States v. Pantohan*, 602 F.2d 855 (9th Cir.1979) adopted the Fifth Circuit "bifurcated test":

first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable given the totality of the objective circumstances. Id. at 857

The statements to government agents in *Pantohan* were not suppressed, because he was not under arrest, the only promise offered was to tell the United States Attorney about his cooperation, and there was no plea offer.

*United States v. Castillo*, 615 F.2d 878 (9th Cir.1980) restates the rule of *Pantohan* as follows:

The defendant must exhibit an actual subjective intent to negotiate a plea at the time of the discussion and the expectation of negotiating a plea must be reasonable, given the totality of the circumstances. Id. at 885

*Castillo* found no ground to suppress because the defendant, a prisoner, was just telling a counselor what he expected, not negotiating, and could have no reasonable expectation because the counselor had no authority to negotiate a plea.

In these and most of the Rule 11(e)(6)(D) cases in the reporters, the defendant has admitted something to a government agent who is not a prosecutor in a situation in which he has waived or has no right to remain silent; he then seeks to suppress it on the ground that he made the admission in the course of making an offer. The problem in such cases is distringuishing plea bargaining from interrogation. In the case at bar, no such problem exists. Far from being an interrogation, the state prosecutor had told Mr. Boltz to just listen, not talk. The discussion was made with prosecutors for the state and federal governments, not investigators or other agents. The government clearly advised that the purpose of the discussion was to negotiate disposition of possible criminal charges.

The federal prosecutor followed up the discussion with letters confirming the threat to prosecute and the offer to avoid prosecution. The totality of the circumstances obviously justified a reasonable expectation of binding negotiations.

The government would have the court interpret the first prong of the test to require that Boltz contemplated pleading guilty to something. Boltz would have the court interpret the first prong to require only that he believed that he was in genuine negotiations regarding disposition of a criminal case. Does the phrase in the rule, "plea discussions," mean only negotiations for a plea of guilty or nolo contendere, or can it mean negotiating immunity to criminal charges and a plea to a civil forfeiture and civil penalty?

■ In the particular factual circumstances of this case, the February 26, 1987 discussions are properly deemed "plea discussions" for purposes of applying Rule 11(e)(6)(D). The presence of federal and state prosecutors who could themselves make binding agreements distinguishes this case from the cases of admissions to government agents. The 1979 amendments narrowed the inadmissibility category by limiting it to discussions with "an attorney for the government," but broadened the category from "an offer to plead" to "plea discussions." The prosecutors offered, quite formally, an agreement, and attempted to persuade Boltz to accept it. Boltz understood them to be negotiating with him for acceptance of the agreement. The Assistant United States Attorney confirmed the correctness of this understanding in his two subsequent letters.

That the government was making the offers instead of Boltz is a distinction without a difference. The government as well as the defense may make offers in the ordinary course of plea negotiations. The Ninth Circuit cases are phrased in terms of the defendant's intent to negotiate a plea, but the facts in those cases did not raise the issue of which side takes the initiative. Congress has made the determination in Rule 11 to encourage plea bargaining.

Where each side has something to offer, either side may make offers.

That the bargain was for immunity, forfeiture, and a civil penalty, rather than a guilty or nolo contendere plea, should likewise make no difference. The contemplated bargain, in any negotiating situation, reflects the value of the desired behavior and the power to compel it. If a defendant's testimony is very highly valued by the government, or its case against him not so important as others, it may offer more in exchange for the testimony.

Were a court to rule that such an offer by the government removes the protective screen of Rule 11, then the rule would protect only defendants with worse cases and less to offer. Suppose, hypothetically, two defendants, A and B. A committed rape, but because of evidentiary problems, the government negotiates for a plea to a lesser crime of sexual assault. B arguably committed a regulatory offense, but the law is not clear, and the government considers it more important to the public to obtain B's cooperation in testifying against C for a more serious crime than to prosecute B. Why shield A's negotiations but not B's? Such a policy would protect A and C, the more serious criminals, at the expense of B. Particularly in light of the 1979 broadening from "offer to plead" to "plea discussions," Congress should not be assumed to have intended so pointless a result.

■ The proposal that Boltz accept a civil fine and consent to forfeiture are enough to amount to a "plea if guilty ... to a lesser or related offense" under Rule 11(e)(1), if the language of that subsection applies to 11(e)(6), since he would have to make a judicial admission of wrongdoing or stipulation to accept the proposed disposition. Nevertheless it is more reasonable to read the phrase "plea discussions" in 11(e)(6) to include offers of immunity, dismissal of all charges, or no prosecution, as well as offers to allow pleas to lesser or related offenses as contemplated by 11(e)(1). *United States v. Mannino*, 551 F.Supp. 13, 17–20 (S.D.N.Y.1982).

■ That the bargaining took place before charges were filed likewise makes no difference. Congress decided to encourage plea bargaining, and it will often make sense to both sides to bargain before charges are filed. The government can thereby avoid an element of impeachment of its witness, as when charges are dismissed in exchange for testimony, and the defendant can avoid the negative consequences which flow in ordinary life from a formal criminal charge, even if subsequently dismissed. That charges were imminent if Boltz did not agree to the government's offer were obvious from Sgt. Mayberry's telephone call inviting Mr. Boltz to the meeting and threatening charges if he did not come, as well as the federal prosecutor's follow-up letters. *United States v. Washington*, 614 F.Supp. 144, 150 fn. 8 (E.D.Pa.1985); *United States v. Mannino*, 551 F.Supp. 13, 17–20 (S.D.N.Y.1982)

The process Boltz was in looked as much like negotiations as any process could. Boltz's attendance was obtained by threatening him with immediate prosecution if he did not attend. The state and federal prosecutors were present. They told Boltz to listen to the offer being made to him and not talk. They assured him that the discussion was off the record and showed him the tape recorder so that he could verify that it was not recording. He was advised that criminal charges would be made against him if he did not testify, and offered immunity, civil penalties, and forfeiture if he did. Anyone would think in these circumstances that he was engaging in negotiations. Since they related to ultimate disposition of a threatened criminal case against him, they are properly characterized as "plea discussions." Most lawyers and laymen would understand the phrase "plea discussions" to mean just such discussions.

IT IS ORDERED that the motion to suppress the statements made during the February 26, 1987 meeting is granted.