UNITED STATES of America, Plaintiff,

v.

Eric HARRIS, Defendant.

Case No. 1:08–cr–00025–SPM–AK.

United States District Court,
N.D. Florida,
Gainesville Division.

Sept. 1, 2009.

Gregory Patrick McMahon, US Attorney, Gainesville, FL, for Plaintiff.

Jon Dirk Uman, Jon D. Uman PA, Gainesville, FL, for Defendant.

### ORDER

MAURICE M. PAUL, Senior District Judge.

This matter is before the Court on Doc. 130, Motion to Suppress by Eric Harris. Mr. Harris moves to suppress statements made to law enforcement officers in April, 2007, as inadmissible plea negotiations covered under Rule 11 of the Federal Rules of Criminal Procedure. The United States contends that there were no plea negotiations within the meaning of Rule 11, and Mr. Harris' statements amounted to no more than a simple confession. A hearing was held on August 20, 2009, and both parties appeared to present orally their arguments. For the following reasons, this Court grants Mr. Harris' motion.

### BACKGROUND

Mr. Harris is no stranger to law enforcement or the courts. In 1991, at the age of 15, Mr. Harris was arrested for Aggravated Battery. He was arrested three times when he was 17, and eight times when he was 18. In 1997, at age 21, Mr. Harris was arrested for possession and sale of cocaine. He began cooperating with law enforcement, telling them from whom he had bought the cocaine. The arresting officer knew that the people from whom Mr. Harris had bought the cocaine were under federal investigation by a local task force, and referred Mr. Harris to a local task force agent, Alachua County Sheriff's Deputy Bart Knowles. Deputy Knowles reached an agreement with Mr. Harris whereby Mr. Harris would work as a confidential informant, and in exchange his charges would be prosecuted in state court and not federally. Deputy Knowles arranged for Mr. Harris to be released from jail the next day.

Under the guidance of Deputy Knowles, Mr. Harris made video—and audio-taped controlled buys, and otherwise cooperated with the joint (state and federal) task force ("JTF") over the next year. Mr. Harris also met with the Assistant United States Attorney, Mr. Sanford, promising to be available to testify in the federal case in return for favorable treatment in state court. In 1998, because of this cooperation, Mr. Harris' cocaine charges were nolle prossed in state court. Over the next ten years, Mr. Harris maintained contact with Deputy Knowles, discussing personal problems with him as well as legal problems. Through that ten years, Mr. Harris says he "called him from time to time to let him know what I was doing; he was just somebody that helped me out when I was trying to get my life together."

On April 19 of 2007, Mr. Harris was subletting an apartment from a Mr. Paul Brown in Harbor Cove. Though he paid Mr. Brown rent, Mr. Harris did not have a key to the apartment. Unbeknownst to Mr. Harris, Mr. Brown had been legally evicted from the apartment, and the doors to the apartment had been locked. Mr. Harris expressed to the apartment managers that he would like to retrieve his personal belongings from the apartment so he could leave, but they said they could not let him. They called the Alachua County Sheriff's Department, who sent two deputies. When the deputies arrived, Mr. Harris explained that he needed to get his things from the apartment. The deputies agreed to escort Mr. Harris into the apartment, but first went in alone because of trespass warnings against Mr. Harris and the other former residents. When the deputies emerged a few minutes later, they were holding a plastic baggie that contained 98 grams of what was later determined to be cocaine. The deputies claimed to have found the cocaine in the part of the apartment in which Mr. Harris had been living. The deputies also found

an illegal Compact Disk ("CD")-creating operation in Mr. Harris' room. Mr. Harris had previously been convicted of copyright infringement for illegally copying CDs.

Fearing prosecution for the cocaine possession and the copyright infringement, Mr. Harris contacted his advisor, Deputy Knowles. Unbeknownst to Mr. Harris, Deputy Knowles had since retired from law enforcement. Deputy Knowles advised Mr. Harris to call JTF Agent Mike Ward, of the Alachua County Sheriff's Department.[1] Mr. Harris immediately called Agent Ward to set up a negotiation meeting, explaining the Harbor Cove incident and his referral from Deputy Knowles.[2]

At his initial meeting with Agent Ward, Mr. Harris indicated that he wanted to cooperate and that he had information that could implicate criminals moving a large amount of drugs in the area. Agent Ward took out a pair of handcuffs and placed them on the table, threatening Mr. Harris with arrest if Mr. Harris didn't say everything he knew. Mr. Harris explained that

he was hesitant to divulge any information about others, because the mere fact that he had that information might serve to implicate him. He was willing to help the government to catch big dealers, but in order to show his knowledge and ability to get close enough to such people to gather incriminating evidence against them, he would have to say things that might incriminate himself as well.

Agent Ward pledged that while he personally could not make any promises, if Mr. Harris became a witness for the government, the government would not be able to use his statements against him. Mr. Harris expressed that he is a single parent of three children, and that he could not go to jail because he has to take care of his children. Agent Ward assured him that while he might face some charges, he would not be indicted[3] or have to do serious jail time if he cooperated, and that if he were to be a witness against the Reeves brothers, anything he said could not be used against him.[4]

---

1. (Unless otherwise noted, quoted testimony is from evidentiary suppression hearing. Questioner is Mr. Uman, counsel for Mr. Harris, and Answerer is Mr. Harris.)

 Q: What was your understanding as to the agencies that were involved?

 A: My understanding was that Mike Ward, Josh Zinger and the other agents that were from Alachua County and Gainesville Police Department and FDLE working as kind of agents for the DEA but for a local DEA which I didn't know that there was a difference.

 TR 24

2. Agent Ward would later resign from the Sheriff's Department and be replaced by Agent Josh Zing. When Agent Zing transferred from the JTF to uniformed patrol status, he would be replaced by Agent Devinny. By the time of the evidentiary hearing on this matter, Agent Devinny testified both as to his personal involvement in the case and based on his personal knowledge of the records kept by his predecessors.

3. Q: You said that they told you you may have to face charges but no indictment what did they mean by that?

 A: Look I can't go to jail three kids I don't have a girlfriend or a wife or anything like that. I take care of them by myself I can't go to jail but I want to cooperate. Basically told me if I did cooperate he could make it where I go to jail get arrested but be out the same thing at worse I probably would have to do some probation or not get charged at all.

 TR 22

4. Q: What did he tell you about the indictment?

 A: Said that I couldn't be indicted because I was going to be a witness against Danny Reaves but I first had to prove that he was a big time drug dealer like I said he was because of that the information that I gave him telling him about Danny and I told him I didn't want to go to jail for telling him everything that I knew said that I couldn't because they would use me as a witness I would take the stand on the prosecutions side.

After being assured that he would not do serious jail time, Mr. Harris divulged that the men who supplied him with cocaine, and the biggest drug traffickers he knew in the area, were the brothers Daniel and Dannie Reeves.[5] Mr. Harris met with Agent Ward several more times fully to debrief and provide all the information he knew about the Reeves brothers and their drug operation. Mr. Harris also signed a Confidential Informant agreement wherein he promised to work with the Alachua County Sheriff's Office and help them gather evidence against any target they wanted him to help investigate. In return for this cooperation, Agent Ward promised that Mr. Harris could not be charged federally.[6]

Mr. Harris worked for Agent Ward, performing controlled buys and debriefing. Mr. Harris made good on his promise to deliver evidence against the Reeves brothers. Prior to Mr. Harris' cooperation, task force agents did not know to investigate the brothers.[7] Agent Ward even advanced Mr. Harris $3200 so Mr. Harris could pay off debts to Dannie Reeves, so that Mr. Harris could set up larger and larger buys to implicate the Reeves brothers.[8] In order to make sure the case against the Reeves brothers could be federal, Mr. Harris was instructed to set up a ten-kilogram cocaine deal.[9] Mr. Harris contin-

Q: So did you tell him everything you knew?

A: Yes, sir.

TR 23–24

5. Q: If you had believed at that moment that they could have used what you told them against you would you have continued to debrief?

A: No, sir I would not have. I would basically said nothing because everything that I did after that was I was taking a risk. I was risking my life. And I wasn't risking my life going out and making buys and is telling them all of that information and coming right back and is having to risk my life in court by making statements. I wouldn't do it. I couldn't go out and work for the government and have somebody liable to get out on me, take my life and come right around and be charged with the same thing that I told them. From what I'm hearing now I might be facing a life sentence which everything I told them was against Danny Reaves....

TR 21–22

6. Q: What was your understanding as to your cooperation as far as Reaves what kind of a case was that going to be?

A: It was made clear from the beginning that if I was able to prove that he was as big a drug dealer as I say he was that it was going to be a federal case but I would not be indicted I would be a witness in the case and I would face my charges in State Court.

TR 24–25

Q: Now you talked about how Ward told you he could make some things happen. Did he explain to you or did you have any understanding as to whether or not he had the authority to make those things happen?

A: Only thing that he could tell me, couldn't promise me anything, by law he couldn't use what I said against me and I couldn't be charged by the Federal Government.

TR 23

7. Testimony of Deputy Travis Devinny, questions by Mr. Uman:

Q: At the time that the cocaine was being purchased from Harris on March 14 and 21st no one had any idea where he was getting his cocaine from?

A: Correct.

Q: You didn't know he was getting it from the Reaves brothers?

A: Yes.

Q: You learned that after he began cooperating and told you?

A: Correct.

TR 73

8. Q: Why were you told to gave Daniel Reaves money?

A: Because I owed money and they wanted to make buys from him so they said they was going to give me the money to pay him.

TR 28

9. Q: Did Agent Zing when he took over from Ward express to you that you needed to buy a

ued to work for Agent Ward even after his Confidential Informant agreement ended, calling Agent Ward when he witnessed suspected drug activity.[10]

Then, in the summer of 2009, the United States indicted Mr. Harris on drug conspiracy charges, relying in part on the statements Mr. Harris made to Agent Ward during his initial bargain.[11]

### ANALYSIS

Under Fed. R. Cr. P. 11(f), the admissibility of a plea discussion and any related statement is governed by Fed.R.Evid 410. Fed.R.Evid 410 currently provides, in relevant part, that any statements made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn, are inadmissible. As Deputy Mike Ward was not an attorney for the prosecuting authority at the time of his April 2007 bargain with

Mr. Harris, it is not immediately apparent that Fed.R.Evid 410 applies here. However, there is relevant authority that expands the analysis further.

 Even if the government negotiator is not an attorney, the evidentiary rule excluding plea negotiations may apply. "To determine whether a discussion should be characterized as a plea negotiation and as inadmissible, the trial court should carefully consider the totality of the circumstances." *United States v. Robertson*, 582 F.2d 1356, 1366 (5th Cir.1978) (*en banc*). "The trial court must apply a two-tiered analysis and determine, first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable given the totality of the objective circumstances." *Id.* The *Robertson* "wholistic examination of the circumstances sur-

---

certain amounts of cocaine in order to make it a federal case?

A: He didn't say a certain amount but kind of implicated that I needed to do more work make more buys bigger buys with Danny. That's when ... we were trying to set up a deal for ten kilos.

Q: With regard to the deal for ten kilos were there other DEA agents involved?

A: Yes, Mike Ward and Josh Zing and I think another supervisor from the DEA drove down to Wildwood to the truck stop met up with another DEA agent from Orlando area and he was going to be the guy that pretended to be the connect for the ten kilos.

TR 29–30

10. (Question by Mr. McMahon for the United States.)

Q: Then I think near the end you said that you were actually calling the police department when major drug dealers would pull up to your store?

A: Yes, sir I called Mike Ward that's what I was instructed to do because some of the guys that they were showing the pictures of would frequently be if the barber shop or in my clothing store so I would call them.

TR 37

11. Testimony of Agent Travis Devinny:

Q: Now when you made some contact with Mr. Harris in the last six or seven months, right?

A: Yes.

Q: And you expressed to him that you were happy with his cooperation?

A: I have always been happy with his cooperation.

Q: He hasn't done anything that would suggest to you other than me filing this motion but Mr. Harris hasn't done anything to violate the terms of that cooperating agreement, has he?

A: Not to me, no.

Q: He did everything that was required of him as far as you know?

A: As far as I know.

Q: After your testimony on June 23, 2009, that's when the superseding indictment against Eric Harris was returned?

A: That's correct.

Q: Based on that testimony?

A: I believe so, yes.

rounding the discussion" is a fact-specific inquiry, rather than a per-se rule. *Robertson*, 582 F.2d at 1368.

In *Robertson*, two men were arrested along with two women for drug offenses, and given proper *Miranda* warnings. The two men asked DEA agents if the women, who they claimed to be innocent, would be released if the men confessed. The DEA agents said they did not have any authority to negotiate or make promises, but they would pass on the information to the judicial authorities. The men confessed, professing the innocence of the women, and the women were indeed released and not charged. The Fifth Circuit, *en banc*, affirmed the panel result denying the defendants' suppression motion under Fed. R.Evid 410, holding that the defendants were not offering a plea but rather waiving their *Miranda* rights to offer probative information exonerating the women.[12] Since 1978, Fed.R.Evid 410 has been amended only to apply to plea negotiations with attorneys or agents of attorneys for the Government. It is instructive, therefore, to incorporate more recent cases into the current analysis.

In *Calabro v. State*, 995 So.2d 307 (Fla. 2008), the state of Florida charged Rodney Calabro with second-degree murder, based in part on statements he alleged were made during plea negotiations. *Calabro*, after expressing that he wanted to avoid trial and have "some kind of plea agreement," confessed in open court to guilt in the charged crime. *Calabro*, 995 So.2d at 309. Applying *Robertson* analysis, the Supreme Court of Florida suppressed the statement, holding that Calabro was "seeking to negotiate a plea agreement" rather than "merely making an admission." *Calabro*, 995 So.2d at 317 (citing *Robertson* ).

In *United States v. Bridges*, 46 F.Supp.2d 462 (E.D.Va.1999), the United States charged Gregory Bridges with preparing false tax returns based in part on a phone conversation in which defense counsel replied in the affirmative when asked by IRS Special Agent Henderson if Bridges "was interested in pleading guilty." 46 F.Supp.2d at 464. The attorney had previously stated that Bridges was "more than willing to cooperate." 46 F.Supp.2d at 463. The court in Bridges first analyzed the applicability of the *Robertson* two-part analysis, collecting circuits applying the two-part test after the amendments to Fed.R.Evid 410.[13] Applying the *Robertson* test, the court in *Bridges* suppressed the statements, performing the two-part test in one step. "The subjective and objective prongs of the test, given the instant facts, collapse into one inquiry because the factors indicating [Defendant's counsel]'s subjective belief are the same factors that demonstrate that such a belief was objectively reasonable." *Bridges*, 46 F.Supp.2d at 466.

In *United States v. Melina*, the defendant expressed concerns to a police officer about discussing the fires under investigation. "He refused to respond to any

---

12. "It is likely that the women were not charged, due, in large part, to the admissions of Robertson and [his co-defendant] coupled with their protestations of the women's innocence." *Robertson*, 582 F.2d at 1370.

13. *See, e.g., United States v. Conaway*, 11 F.3d 40, 42 (5th Cir.1993) (stating Fifth Circuit uses two-part Robertson test to evaluate claim that records should be excluded under Rule 410 and Rule 11(e)(6)); *United States v. Little*, 12 F.3d 215, 1993 WL 501570, *3 (6th Cir. 1993) ("[W]e adopt the test set forth in *United States v. Robertson*, 582 F.2d 1356, 1366 (5th Cir.1978) ..."); *United States v. Leon Guerrero*, 847 F.2d 1363, 1367 (9th Cir.1988) ("A statement was made in the course of plea discussions if: (1) the suspect exhibited an actual subjective expectation that he was negotiating a plea at the time of the discussion; and (2) the suspect's expectation was reasonable given the totality of the circumstances.").

questioning until he had received certain assurances from the county attorney concerning, among other things, the severity of the charge he would face." 868 F.Supp. 1178, 1181–82 (D.Minn.1994). After being assured that he would not be charged with first degree arson *by the police officer,* he confessed in writing. Applying the *Robertson* test, the court rejected the Government's proposed strict binary classification distinguishing a confession bargain from a plea bargain, and suppressed the statement under Fed. R.Evid 410. The court was persuaded by Judge Moran's concurring opinion in *Robertson,* which defined the critical question as "not whether Robertson pled guilty but whether such a plea was contemplated by the pre-arraignment negotiations." 582 F.2d at 1371–73 (Moran, J., Concurring). Other courts, as well, have granted defendants suppression based on bargains made with police officers. *See, e.g., United States v. Swidan,* 689 F.Supp. 726, 729 (E.D.Mich.1988) ("The 'disclaimer' by the agent that he lacked authority to plea bargain was ineffective to render the defendant's expectation unreasonable.... The agent did not discourage defendant by this reply, but rather encouraged him to make his offer."); *United States v. Mannino,* 551 F.Supp. 13, 18 (S.D.N.Y.1982) (applying *Robertson* factors and suppressing statements made to convince authorities not to indict federally, and only secondarily to cooperate if defendants were indicted).

■ Here, a defendant with a ten-year history of cooperation with the local JTF and the Alachua County Sheriff's Department initiated a conversation with a JTF Agent in order to bargain to be charged in state court rather than federally, if he were to be charged at all. Expressly stating that he did not want to say anything to incriminate himself, Mr. Harris made inculpatory statements only after Agent Ward promised him that, while he might face charges, he would not have to face federal indictment. That is precisely the deal he reached ten years earlier with JTF Agents and the Assistant United States Attorney, so he believed he could reach it again.

In reliance on the JTF Agent's promise, Mr. Harris established his *bona fides* by relating his extensive history in the local drug trade, thereby inculpating himself. Mr. Harris entered into a Confidential Informant agreement with the Alachua County Sheriff's Department, whereby he would perform controlled buys, allow himself to be audio—and video-recorded, and relay as much information as possible to law enforcement. Because of his cooperation, the JTF was able to infiltrate and build a federal case against a large drug trafficking organization. Mr. Harris also accepted considerable risk as part and parcel of his bargain; large-scale drug traffickers do not generally treat those they find gathering evidence against them kindly. Mr. Harris may partly have cooperated with law enforcement out of the kindness of his heart, but he also cooperated as part of a very specific bargain—that he may face state charges, but would not have to face federal indictment.

After he willingly put himself in jeopardy of life and limb helping law enforcement infiltrate a large drug trafficking organization specifically to avoid jail, the Government now seeks to put him in jeopardy of life in prison, using statements he gave as part of his bargain. "In those situations in which the accused's subjective intent is clear and the objective circumstances show that a plea bargain expectation was reasonable, the inquiry may end." *Robertson,* 582 F.2d at 1367.

Here, the accused did not make any inculpatory statements until he had secured a specific bargain from an agent of an organization with which he had a ten-year cooperative relationship. He recited

to the Agent what he wanted, to avoid federal indictment, and why he wanted it, because he is a single father of three children and cannot suffer the long federal prison sentences. He was never *Mirandized,* instead being told that nothing he said could be used against him if he was a witness for the prosecution. He accepted considerable risk of injury or death as part of the bargain. In direct and reasonable reliance on the efficacy of the bargain, he made statements inculpating himself. Those statements are inadmissible.

The Government's argument that the statements must be admissible because they were not made to an Assistant United States Attorney or an agent with authority to negotiate for such an attorney is unpersuasive because the proper test examines the totality of the circumstances informing the defendant's belief, not the objective express authority of the government negotiator. "To have the scope of Rules 410 and 11(e)(6) turn simply on whether the government agent had actual authority to negotiate a plea, as the government argues, would create an unfair trap for the unwary defendant or defense attorney and perhaps invite government agents to set or spring unfair traps by calculated questions or remarks." *Bridges,* 46 F.Supp.2d at 466. Rather, this Court must examine the totality of the circumstances in analyzing Mr. Harris' beliefs. *Robertson,* 582 F.2d at 1366. Mr. Harris' expectation that Agent Ward had the authority to negotiate the bargain they reached was informed by his ten year cooperative relationship with the JTF, during which Deputy Knowles promised and delivered exactly the sort of bargains Mr. Harris requested of Agent Ward. As in *Swidan,* "The 'disclaimer' by the agent that he lacked authority to plea bargain was ineffective to render the defendant's expectation unreasonable.... The agent did not discourage defendant by this reply, but rather encouraged him to make his offer." 689 F.Supp at 729. "Un-

der the government's proposed strict interpretation of Fed.R.Evid. 410(4), an agent need only propose to relay any offers to the prosecuting attorney, and thus preserve the government's freedom to choose to enter into plea discussions or to use the statements against the accused. This does not protect the plea discussion process." 689 F.Supp. at 728.

The Government has declined to call any witnesses or present any testimony to contradict the relevant testimony of Mr. Harris. Though Mr. Harris called the new JTF Agent on his case to the stand, that Agent had no personal knowledge of his bargain with Agent Ward. The Government declined to present any evidence that the bargain was not made exactly as Mr. Harris describes and for the precise reasons Mr. Harris describes. It is unknown, therefore, whether the Government knew about the promises made by Agent Ward or about Mr. Harris' reasonable reliance on them.

This analysis and ruling has no effect on the admissibility of other evidence in the case, which Mr. Harris concedes may properly be admitted against him. This includes the cocaine seized from the Harbor Cove apartment as well as audio—and video-recorded evidence of Mr. Harris allegedly selling cocaine to a different Confidential Informant (Torey White) on March 14 and March 21, 2007. While Mr. Harris might not receive the full benefit of his bargain with the Agents of the JTF, as he is indeed charged in federal court, he will not be penalized for attempting to bargain that no-federal-indictment plea deal. Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

1. Doc. 130, Motion to Suppress by Eric Harris, is GRANTED.