## STATE

v.

## Michael A. TRAFICANTE.

### No. 93–420–M.P.

Supreme Court of Rhode Island.

Jan. 25, 1994.

Jeffrey Pine, Atty. Gen., Thomas Dickinson, Asst. Atty. Gen., for plaintiff.

Joseph Kelly Mark DeSisto and Patricia Buckley, Carroll, Kelly & Murphy, Providence, for defendant.

## OPINION

MURRAY, Justice.

This matter is before the court pursuant to a petition for certiorari. The State of Rhode Island filed this petition, seeking review of a District Court judgment excluding certain statements made by the defendant, Michael A. Traficante (Traficante), during a meeting with the Attorney General.

On October 13, 1992, Traficante, the mayor of Cranston, was charged and indicted on five counts of filing false documents with a public official, three counts of filing false documents with the Ethics Commission, and one count of failing to report campaign contributions. Subsequently Traficante filed a motion in limine, based upon Rule 410 of the Rhode Island Rules of Evidence, to exclude certain statements that he had made during a June 3, 1992 meeting with then-Attorney General James O'Neil (O'Neil), an assistant attorney general and a representative of the Rhode Island State Police (State Police).

The trial judge ruled that the statements were made in the course of plea discussions and were consequently inadmissible according to Rule 410.

The circumstances that led to the June meeting were as follows. In early 1992 the Attorney General, pursuant to information received from the Rhode Island Department of Business Regulation, was engaged in investigating Stephen Cross (Cross) in connection with a possible embezzlement of funds from a number of annuity accounts. In furtherance of this investigation the State Police contacted Traficante to inform him that he was a possible victim of embezzlement. Traficante declined to make a comment and referred the matter to his attorney, Marc DeSisto (DeSisto) of the law offices of Carroll, Kelly & Murphy. DeSisto informed the State Police that Traficante did not wish to file a complaint because he was embarrassed by the entire situation with Cross. At the same time that the State Police were investigating Cross, the Attorney General was exploring allegations of corruption in the city of Cranston. As of result of the Cranston corruption probe, several officials from the city of Cranston were indicted.

After informing the State Police that Traficante did not wish to pursue the Cross matter, DeSisto was subsequently contacted by the Office of the Attorney General. The Attorney General's office communicated that it was interested in speaking with Traficante and that if he did not meet voluntarily with representatives of the Attorney General's office, he would be subpoenaed to appear before a grand jury. DeSisto replied that the Cross matter was a personal affair and that Traficante would not voluntarily cooperate. O'Neil then personally telephoned DeSisto, and a meeting at the offices of the Attorney General was arranged. At that meeting Joseph Kelly (Kelly), also representing Traficante, informed O'Neil that Traficante would cooperate fully with the Cranston corruption probe but would not discuss the Cross matter. It is not necessary to address further the substance of that meeting as Traficante was not present and that meeting was not the subject matter of the motion that was before the lower court.

The June 3 meeting took place at the law office of Carroll, Kelly & Murphy. Present at the meeting were O'Neil, assistant attorney general Terrence Donnelly (Donnelly), Corporal Harry Watson of the State Police (Watson), Kelly, DeSisto, Traficante, and Ann Marie Traficante, Traficante's wife. The parties have conflicting views regarding the purpose behind and the substance of the meeting.

The testimony from the lower-court hearing revealed the following factors regarding the content of the June 3 meeting. Kelly indicated that he went to the meeting "contemplating working this out one way or another." Kelly testified that the gathering commenced with O'Neil's statement that he had requested the meeting to discuss the Cross matter and to see whether the parties could reach a "confidential" resolution. Kelly stated that during the meeting certain statutes were discussed regarding the failure to report campaign contributions. Kelly also testified that he discussed the Cross matter in a "factual vein." Kelly stated that previous to the June 3 meeting he had spoken to O'Neil about the Cross matter only in a hypothetical form. Kelly indicated that it was O'Neil's position that Traficante's behavior "fell within the concept of a petit misdemeanor." Kelly testified that at the end of the meeting, after hearing the revelations of Traficante, O'Neil stated, "I make no promises, but I think I'm going to give this a pass-through."

Traficante testified that his attorneys made it clear to him that the Attorney General wanted to meet with him in a "confidential meeting to hopefully resolve the matter dealing with the Cross investment." Traficante also testified that DeSisto explained to him that the term "pass-through" meant that "the personal investigation [into the Cross matter] is over."

O'Neil testified that his purpose in requesting the June 3 meeting was to confront Traficante on his public statements that he was cooperating with the Cranston corruption investigation and contrast it with what he perceived was Traficante's private position of noncooperation. As a courtesy O'Neil wished to inform Traficante that he was pursuing the overall investigation into the Cranston corruption affair, which at that time, he considered, included the Cross matter. After his introductory comments at the meeting, O'Neil testified that Kelly voluntarily discussed the origin of the funds that Cross had embezzled. In fact Donnelly testified that Kelly's factual vein description of the source of the Cross funds was not elicited in response to any question from representatives of the Attorney General's office. After Kelly's revelations Traficante and his wife disclosed how proceeds at certain fundraising events were collected. O'Neil testified that although Kelly discussed statutes, he, however, did not. O'Neil "did not draw any conclusions * * * that a crime had been committed" until after the June 3 meeting. O'Neil denied using the word "confidential" in describing the meeting and also denied stating that he would give the situation a so-called pass-through.

On June 8, 1992, Kelly informally met O'Neil on Dorrance Street in Providence. Kelly testified that O'Neil informed him that he was reversing his position that he would give the Traficante matter a pass-through. O'Neil contended that the only position that he was reversing was the timing of publicly identifying Traficante as a target of an investigation relative to the Cross matter.

■ The state contends that the trial judge erred by (1) classifying the discussions during the June 3 meeting as plea discussions and (2) excluding a portion of Traficante's testimony regarding his lack of subjective intent to plead guilty. We note at the outset that our standard of review is deferential. We shall not disturb the findings of a trial justice sitting without a jury unless it can be shown that he or she overlooked or misconceived relevant and material evidence or was otherwise clearly wrong. *See Cerilli v. Newport Offshore, Ltd.,* 612 A.2d 35, 39 (R.I.1992).

Our analysis involves a matter of first impression within this jurisdiction, that is, the application of Rule 410 as it defines plea discussions. Rule 410 states in pertinent part:

"Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:

\*   \*   \*   \*   \*   \*

(4) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or nolo contendere or which result in a plea of guilty or nolo contendere later withdrawn."

For the purposes of this instant action, the applicable section of Rule 410 substantially tracks the language of its federal counterpart, Rule 410 of the Federal Rules of Evidence.[1] Hence for guidance in this area we turn our attention to case law interpreting the federal rule.

The purpose of both Rhode Island and Federal Rule 410 is to promote the disposition of cases through plea bargaining. The rule encourages free dialogue between the accused and the government by barring admissions during plea negotiations from later introduction as evidence against the accused. This type of evidence can be a very powerful tool for the government, but its use can be devastating to the accused. Captain William H. Ibbotson, *Military Rule of Evidence 410: The Pitfalls of Plea Negotiations,* Army Law. 32 (1988). The United States Supreme Court emphasized the importance of plea bargaining by stating that "[w]hatever might be the situation in an ideal world, the fact is that the guilty plea and the often concomitant plea bargain are important components of this country's criminal justice system. *Properly administered,* they can benefit all concerned." (Emphasis added.) *Blackledge v. Allison,* 431 U.S. 63, 71, 97 S.Ct. 1621, 1627, 52 L.Ed.2d 136, 145 (1977).

■ Our attention must now turn to how this court defines plea discussions. *"Plea bargaining implies an offer to plead guilty upon condition.* The offer by the defendant must, in some way, express the hope that a concession to reduce the punishment will come to pass. A silent hope, if uncommunicated, gives the officer or prosecutor no chance to reject a confession he [or she] did not seek." (Emphasis added.) *United States v. Levy,* 578 F.2d 896, 901 (2d Cir. 1978).

"[P]lea negotiations contemplate a bargaining process, a 'mutuality of advantage,' \* \* \* and a mutuality of disadvantage. That is, the government and the accused both seek a concession for a concession, a *quid pro quo.* \* \* \* The accused contemplates entering a plea to obtain a concession from the government. The government contemplates making some concession to obtain the accused's plea." *United States v. Robertson,* 582 F.2d 1356, 1365–66 (5th Cir.1978).

The *Robertson* court held that in order to determine whether a discussion should be characterized as a plea negotiation, the court should carefully consider the totality of the circumstances. *See id.* at 1366. Consequently, each case must be reviewed on its own facts. *Id.* The *Robertson* court concentrated specifically on the accused's perception of the discussions and developed a two-tiered analysis in order to determine whether discussions were in fact plea discussions under Federal Rule of Evidence 410. 582 F.2d at 1366.

"The trial court must apply a two-tiered analysis and determine, first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable given the totality of the objective circumstances." *Id.*

The critical element of the *Robertson* test is defining the defendant's subjective intent and expectations. *Id.* This is not an easy task. In situations "in which the accused's subjective intent is clear and the objective circumstances show that a plea bargain expectation was reasonable, the inquiry may end." *Id.* at 1367. In situations in which the record is unclear concerning the subjective intent on the part of the accused, the totality

---

1. *See* R.I.R.Evid. 410 Advisory Committee Notes; James Moore, *Moore's Federal Practice, Federal Rules of Evidence,* Part 2, Rule 410 at 140–41 (1991); Jack B. Weinstein and Margaret A. Berger, 2 *Weinstein's Evidence* ¶ 410[09] at 410–76 (1991).

of the objective circumstances must be reviewed. *Id.* "[A] wholistic examination of the circumstances surrounding the discussion [must be performed]." *Id.* at 1368. The government bears the burden of proving that the discussions did not constitute plea negotiations. *Id.* at 1366 n. 21.

A number of federal circuits have adopted the *Robertson* test. *See, e.g., United States v. Grant,* 622 F.2d 308, 312 (8th Cir.1980); *United States v. O'Brien,* 618 F.2d 1234, 1240–41 (7th Cir.), *cert. denied,* 449 U.S. 858, 101 S.Ct. 157, 66 L.Ed.2d 73 (1980); *United States v. Pantohan,* 602 F.2d 855, 857 (9th Cir.1979); *United States v. Geders,* 566 F.2d 1227, *rev'd,* 585 F.2d 1303 (5th Cir.), *cert. denied,* 441 U.S. 922, 99 S.Ct.2031, 60 L.Ed.2d 396 (1979). Other courts simply apply the plain language of the rule to the facts before them in almost a "quasi-*Robertson* test" of the totality of the circumstances. *See United States v. Penta,* 898 F.2d 815 (1st Cir.), *cert denied,* 498 U.S. 896, 111 S.Ct. 246, 112 L.Ed.2d 205 (1990).

In *United States v. Washington,* 614 F.Supp. 144 (E.D.Pa.1985), *aff'd,* 791 F.2d 923 (3d Cir.), *cert. denied,* 479 U.S. 841, 107 S.Ct. 150, 93 L.Ed.2d 90 (1986), the court placed an affirmative duty on a prosecutor to state at the beginning of conversations whether statements made could be later used against the defendant. This doctrine was summarized as a rule of *caveat prosecutor.* *Id.* at 151; *see also United States v. Herman,* 544 F.2d 791, 796 (5th Cir.1977). This "bright line" approach has not gained widespread acceptance in other jurisdictions. *See generally* Ibbotson, Army Law. at 35.

■ We now choose to adopt the *Robertson* test.[2] The first tier of the *Robertson* test examines whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussions in question.

"The initial inquiry into the accused's subjective state of mind *must be made with care to distinguish between those discussions in which the accused was merely making an admission and those discussions in which the accused was seeking to negotiate a plea agreement.* * * * In those situations in which the accused's subjective intent is clear and the objective circumstances show that a plea bargain expectation was reasonable, the inquiry may end." (Emphasis added.) *Robertson,* 582 F.2d at 1367.

Our review of the record reflects that Traficante did not exhibit any expectation of negotiating a plea. Kelly testified that at the June 3 meeting he never offered to have Traficante plead guilty to any crime, nor did he offer to accept a plea offer. DeSisto testified that he understood that the purpose of the meeting was to try to convince the Attorney General that Traficante had not committed any crime. He also stated that it would be "tough to characterize [the June 3 meeting] as a plea bargain." Traficante testified that, relying on his attorneys' representations, he did not contemplate pleading guilty to any crime.

In ruling that the discussions were made during plea negotiations, the trial judge deemphasized Traficante's admissions concerning his subjective intent. In his ruling the trial judge stated:

"The court is very mindful of the fact that this defendant is the Mayor of a large city and *for him to testify* at the hearing on the motion in limine *that he did intend to plead or for his attorneys to in fact testify that he did intend to plead* not even knowing what the offer would be *the defendant would be admitting that he was guilty of some criminal offense in the public's perception* even though the defendant could plead to a violation which is not a criminal offense or incur civil sanctions or the matter could proceed to trial and the defen-

---

**2.** We note that Federal Rule of Evidence 410 was amended effective December 1, 1980. This amendment does not affect our analysis or our application of the *Robertson* test. *See* post–1980 cases cited herein, and *see generally United States v. Sitton,* 968 F.2d 947, 957 (9th Cir.), *cert denied,* —— U.S. ——, 113 S.Ct. 478, 121 L.Ed.2d 384 (1992), —— U.S. ——, 113 S.Ct. 1306, 122 L.Ed.2d 695 (1993) (discussing the amendment and applying the *Robertson* test); David W. Louisell and Christopher B. Mueller, 2 *Federal Evidence,* § 184 at 506–08 (1985); 2 *Weinstein's Evidence* ¶ 410[08] at 410–60.

dant be found not guilty." (Emphasis added.)

The trial judge ignored the representations on the record of Traficante's subjective intent and instead substituted an empathetic speculation.

The trial judge appears to have carved out a political "escape clause" in *Robertson's* first prong. The risk of public embarrassment is attendant to holding public office. That risk cannot be used to create a unique standard for analyzing intent of public officials. If in fact we were to subscribe to the trial judge's reasoning, he would have us believe that Traficante thought more of his political reputation and public perception than he did of the judicial proceeding and its possible ramifications. We believe that the record reflects that Traficante displayed a clear subjective intent not to enter into plea discussions.

The trial judge, relying upon the record and the fact that "defendant brought his closest confidante, his wife, to the meeting" found that Traficante "exhibited an actual subjective expectation to negotiate a plea at the time of the discussion." We do not agree with the trial judge's observation regarding Traficante's intent. In fact a review of the record informs us that it was Kelly's idea that Traficante's wife attend the meeting. It is our view that the trial judge placed undue emphasis on the fact that Mrs. Traficante attended the meeting in light of the admissions of Traficante and his counsel.

Additionally we believe that the record reflects that the objective circumstances surrounding this matter show that a plea-bargain expectation was unreasonable. "[T]he quintessential *quid* of a plea negotiation *quid pro quo* was missing." *Robertson,* 582 F.2d at 1369. Traficante "did not contemplate entering a plea of guilty in order to obtain [government concessions]. A bargained confession, without more, is not a plea negotiation." *Id.* See generally *United States v. Porter,* 821 F.2d 968, 977 (4th Cir.1987), *cert. denied,* 485 U.S. 934, 108 S.Ct. 1108, 99 L.Ed.2d 269, *reh. denied,* 485 U.S. 1042, 108 S.Ct. 1605, 99 L.Ed.2d 919 (1988); *United States v. Karr,* 742 F.2d 493, 496 (9th Cir. 1984); *Levy,* 578 F.2d at 901 ("[p]lea bargaining implies an offer to plead guilty upon

condition"); *United States v. Lau,* 711 F.Supp. 40, 42–43 (D.Me.1989).

Kelly testified that the words "plea bargain" or "negotiate a guilty plea" were never mentioned in arranging the June 3 meeting. See *Lau,* 711 F.Supp. at 42. DeSisto testified that Traficante did not ask for immunity. In fact Donnelly testified that there were no plea discussions and no discussion of any statutory violation prior to Kelly's recitation of the source of the Cross-invested funds. Donnelly averred that there was no discussion of possible criminal or civil penalties that Traficante would accept in return for an admission of guilt. He also testified that, at the time of the meeting, there were no criminal allegations against Traficante. O'Neil supported this contention by testifying that he had no evidence before the June 3 meeting that Traficante had committed any crime.

The state suggests that plea bargaining can occur only after a defendant has been arrested, charged, or indicted. Traficante attempted to show at the trial, and now argues in his memorandum, that he was the subject of an investigation. None of these issues is dispositive on the question of whether discussions can be characterized as plea discussions. Although no single factor is controlling in our analysis, these factors may be taken into consideration in the totality of the circumstances. See generally *United States v. Guerrero,* 847 F.2d 1363, 1368 (9th Cir.1988); *United States v. Boltz,* 663 F.Supp. 956, 961 (D.Alaska 1987); *Washington,* 614 F.Supp. at 146; Jack B. Weinstein and Margaret A. Berger, 2 *Weinstein's Evidence,* ¶ 410[09] at 410–61 (1991) (noting that an indictment or information filed creates a "strong inference" that plea negotiation occurred).

In assessing the reasonableness of Traficante's belief that he was engaged in plea discussions at the June 3 meeting, we may consider such factors, among others, as whether Traficante "was in custody or charged with any crime, and whether there was any discussion of pleas or charges." *Guerrero,* 847 F.2d at 1368. We view the record as absent any significant evidence of these factors.

Additionally, both O'Neil and Donnelly testified that there were no promises made and that no statement concerning a pass-through was ever mentioned. A scrutiny of the entire dialogue in the transcript convinces this court that the term "pass-through" was an ambiguous utterance without definition. This ambiguous phrase did not transform the "interview into a plea discussion." *See Guerrero*, 847 F.2d at 1368. We believe that the totality of the circumstances did not justify any expectation of binding plea negotiations. Therefore, we hold that the trial judge was clearly wrong in ruling that Traficante had the necessary reasonable subjective intent required to classify the June 3 meeting as a plea discussion. Consequently "[s]tatements such as these, made in the absence of plea negotiations, are reliable [and] probative [and] * * * admissible." *Robertson*, 582 F.2d at 1370.

On the basis of the disposition of the previous issue, we need not reach the merits of the state's remaining argument.

Accordingly, for the reasons stated, the state's petition for certiorari is granted. The District Court judgment excluding the discussions is quashed, and the records certified to this court are remanded to the District Court with our decision endorsed thereon.