**STATE**

v.

**Edwin B. EDWARDS III.**

No. 2001–389–C.A.

Supreme Court of Rhode Island.

Nov. 25, 2002.

Annie Goldberg, Aaron Weisman, Providence, for Plaintiff.

Thomas Dickinson, Christopher S. Gontarz, Providence, for Defendant.

Present: WILLIAMS, C.J., and LEDERBERG, FLANDERS, and GOLDBERG, JJ. and WEISBERGER, C.J. (Ret.).

## OPINION

WEISBERGER, Chief Justice (Ret.).

This case comes before us on the appeal of Edwin B. Edwards III (Edwards or defendant) from a judgment of conviction entered in the Superior Court of the crime of domestic murder in the first degree, following a jury-waived trial that began on January 8, 2001, and concluded on January 23, 2001. The trial justice found the defendant to be guilty of domestic murder in the first degree and further found beyond a reasonable doubt in accordance with G.L. 1956 § 11–23–2(b)(4) that the defendant had committed this murder in a manner involving torture and aggravated battery to the victim. The trial justice proceeded to hold a sentencing hearing during which she took into account this aggravating factor and such mitigating factors as the defendant chose to present. She determined that the aggravating factor outweighed any mitigating factors, and sentenced the defendant to life imprisonment without parole. We affirm the conviction and also

the sentence. The facts and procedural history of this case insofar as pertinent to this appeal are as follows.

This is a saga of a tragic quarrel between two people who had participated in a romantic relationship for approximately three years, according to the findings of the trial justice set forth in a carefully crafted and lengthy decision. The couple met in October 1996 at Rhodes on the Pawtuxet and began a substantive dating relationship. They were both in their late forties. Jeanne Robinson (Jeanne), the victim, had been married once before, to Wayne Robinson, and had two adult children from that marriage. She maintained a close relationship with her family. The defendant had been married twice before, first to Susanne Murray and then to Cynthia Edwards, but had no children. Jeanne worked as a charge nurse, and Edwards worked as a truck salesman for Colony Ford. Jeanne resided at 167 Fiat Avenue in Cranston, Rhode Island. Edwards maintained a nearby apartment in Cranston, where he lived by himself when he was not cohabitating with Jeanne at her house. The couple had had a rather turbulent relationship during the course of their dating and romantic involvement. There were quarrels that almost ended the relationship in 1997. However, by the end of 1998 Jeanne and Edwards became engaged. He gave her an expensive diamond ring (which he said cost $9,000). No date was set for a wedding.

The couple decided to postpone a wedding date until after the wedding of Jeanne's daughter, Jendra (which was scheduled to take place on September 18, 1999). The relationship between Jeanne and Edwards almost ended a month or so before the wedding. Jeanne discovered for the first time that Edwards had been married twice before. Until that time she had not known about his first wife.

Jeanne told Edwards that she did not wish to see him anymore. His reaction made Jeanne fear for her life. However, the quarrel was resolved with the help of Jeanne's father (Albert Girard, Sr.), and Jeanne invited Edwards to attend her daughter's wedding.

The prospect of attending this wedding was emotionally difficult and challenging for Edwards. He did not wish to interact with or be in the company of Jeanne's former husband and his family. Edwards was also jealous of the close relationship that Jeanne maintained with her family.

During the course of the relationship, Jeanne had recommended to Edwards that he should have medical assistance in order to manage his tendency towards anger. He consulted with physicians, including a psychiatrist, Dr. Susan DiMase, who recommended medications. His primary physician was a Dr. Savoretti who prescribed, among other medications, Klonopin. Edwards filled this prescription twice according to the findings of the trial justice. The recommended dosage was one to two tablets, twice a day as needed for anxiety. Although other medications were recommended by various physicians, as well as by Dr. Savoretti, the Klonopin became of paramount significance in the course of this trial.

On September 18, 1999, the day of Jendra's wedding, Jeanne was an excited mother of the bride, exhilarated by the prospect of the marriage. Edwards, on the other hand, did not really want to go to the wedding. He did not want to meet the family of Wayne Robinson or interact with Jeanne's family. Nevertheless, Edwards dressed in a tuxedo and assisted with the arrangements for a party that Jeanne was expecting to host at her house after the wedding. He carried beer and ice into the backyard and set up tables. Edwards had one beer but gave no signs of intoxication.

He drove Jeanne and her friend, Josee Davis (Josee), to the wedding. During the ride, Edwards and Jeanne had an argument about medication. He took a pill from a vial over Jeanne's objection. At no time during the drive or at any time earlier in the day did Edwards show any outward signs of intoxication.

Edwards did not enjoy the interaction with Jeanne's family and that of her ex-husband during the course of the wedding and the reception in Bristol. Ultimately, Edwards, Jeanne, and Josee left the wedding reception at about 10:30 p.m. There was no plan for the guests to return to Jeanne's house for further celebration. Edwards drove, Jeanne sat in the passenger seat, and Josee sat in the back seat. The drive from the reception in Bristol to Jeanne's house in Cranston required about thirty minutes of travel. The trial justice found that defendant had no difficulty driving home. His speech was fine. He did not appear to take any pills or have any conversation about medication on the way home. Edwards did state in the course of talking about the wedding that he did not want anything to do with the family of Jeanne's former husband. As they neared Jeanne's house, she told Edwards that she would like to go to bed and that she would like him to leave. She said that she wasn't feeling well.

Edwards drove into the driveway of Jeanne's house. All three left the car, Josee went into Jeanne's house to obtain her automobile keys so she could drive home. Jeanne and Josee spoke for a few minutes before Josee left. Josee departed for her home in Warwick sometime after 11 p.m. on September 18.

After Josee's departure, Jeanne again told Edwards to leave. They exchanged some harsh words, which resulted in Jeanne's removing her engagement ring and throwing it at Edwards. He attempted to find the ring, and eventually found it with the assistance of a flashlight that Jeanne provided to him. He put the ring back in its box and placed the box in his automobile. He then reentered the house through the outside door which was unlocked.

When he arrived at Jeanne's bedroom, he found that the door was locked. He asked Jeanne to let him in, and when she refused, he kicked the door and broke its lock. By his own admission, he then choked Jeanne while she was in her bed. He released her and she arose from the bed crying for help, asking him why he had done it. She went downstairs to the kitchen and drank some water to catch her breath. Edwards seized a large flashlight, which was on the table, and struck her with it repeatedly. Both Edwards and Jeanne fell to the floor. Jeanne then stood up and went outside, with Edwards following. Jeanne was saying in a soft voice, "Help me, Help me." At this point, Edwards got into his automobile and ran over Jeanne twice, crushing her with the weight of the car.

A neighbor, Alma Miller, who had been a friend of Jeanne for more than twenty years, heard the call for help from outside. She opened the door and turned on the lights. She saw Edwards drive the car backward and forward and then leave the driveway. She saw the body. She took her cell phone and a flashlight and ran out to the street where the body lay. The body was lying in the roadway with injuries so severe that it was unrecognizable to Alma Miller. To Alma, Jeanne looked like "a rag doll." At this point she called 911 and summoned the police. A Sergeant Russell Henry of the Cranston Police Department arrived and saw the body of the victim, who was covered with "road rash," a combination of dirt and lacerations from her body's hitting the pavement. Al-

though he found pictures of Jeanne in the house, he could not make a positive identification. He noticed blood in the street and in the driveway. Inside the house he noted large puddles of blood in the kitchen, blood smears on the kitchen floor, and a large black flashlight covered with blood on the kitchen floor.

Meanwhile, Edwards, at about 12:04 a.m. on September 19, used his cell phone to call his sister, Debbi Pappas, who was the chief secretary and records clerk for the Portsmouth Police Department. He told her "I think I am in trouble. I killed Jeanne." He further told his sister that he was driving to the Newport bridge to jump into the water because he did not want to go to the Adult Correctional Institutions (ACI). He said, "I am wearing a tuxedo and its covered in blood." He further said, "I hit her with a flashlight and ran her head over twice." To his sister he sounded intoxicated, or at least she knew that something was wrong with him. At 12:17 a.m., Edwards called his sister, Cindy, and told her that he was heading to the bridge to jump. At about this point, he arrived at the Newport Bridge and drove to the center span. His presence was noted by Stephen Clarke (Clarke), the supervisor who was working at the entrance of the Newport Bridge in Jamestown. Clarke notified the State Police and the Newport Police and then drove to the top of the bridge in his own emergency vehicle. Neither Clarke nor James Romano, the toll collector, noticed that anyone came through the toll booth without paying. Romano noticed no erratic driving by anyone at the top of the bridge. Two Newport patrol cars arrived and a Jamestown patrol car happened to be on the bridge, as well.

The defendant's car was found parked directly against the curb rail at the top of the bridge. The motor was turned off and the emergency flashers were on. Officer Silvia, of the Newport Police, discovered Edwards, who had crawled over the side of the bridge onto a platform and thence to an I-beam situated between six and eight feet from and parallel to the side of the bridge. This I-beam normally would be used by people repairing the bridge. The defendant was seated, straddling the I-beam, facing Newport, more than 200 feet above the water.

Detective Frank Rosa (Det.Rosa) was an old family friend of Edwards and had attended Edwards' wedding to his second wife. After some preliminary conversation, during which Det. Rosa attempted to persuade Edwards to return to the safe portion of the bridge, Edwards told Det. Rosa that he had done something that he could not deal with. He held up his hands and said, "I killed her, I killed her." He asked Det. Rosa to notify the Cranston Police to go to 167 Fiat Avenue (Jeanne's address). He said to Det. Rosa, "You just don't understand, I can't go to the A.C.I. or the loony house. This is her blood on my hands * * *." "I killed her tonight. I beat her with a flashlight. I ran her over with my car twice." Ultimately, after a great deal of conversation in which Edwards again said that he kicked in Jeanne's bedroom door, beat her, dragged her outside, slammed her head into the driveway and ran over her to kill her, the officers, including a state trooper, persuaded Edwards to come to the railing, whereupon they seized him and pulled him back on the bridge. They then placed him in handcuffs and took him to the emergency room at the Newport Hospital for evaluation. They left the bridge at 1:51 a.m. From their conversation, the officers believed that Edwards had taken a large amount of pills for anxiety and depression. They reported this to the doctor at Newport Hospital. At the hospital, Edwards told Nurse Catherine Aubin (Nurse Aubin)

at the emergency room about the events of the night, including his killing Jeanne. He also told her about taking twenty Buspar pills (an antidepressant medication). Shortly after 2 a.m., he was examined by Dr. James Gleason (Dr. Gleason), an emergency room physician. He told Dr. Gleason about his strangling his fiancée.

At about 2:15 a.m., Det. Rosa administered Miranda admonitions to Edwards, and the officer took him into custody as a suspect in a homicide case. Edwards then was taken to the Newport police station to be booked. Later in the morning, he was transferred to the Cranston police station, where he was given a written form containing Miranda admonitions. He signed the form. Thereafter, he made statements to Detective Richard Falcone of the Cranston police consistent with the earlier statements he had made about the killing. He further expressed concerns about his personal effects and declined to speak any more without counsel.

Meanwhile, the Cranston police investigated the scene of the crime and noted the blood in the house and on the driveway, and also found blood on the undercarriage of defendant's car when it was transferred to Cranston. An autopsy report disclosed extensive injuries resulting from blunt force and compressive trauma of the torso. These findings, in the opinion of the chief medical examiner, were consistent with being run over and compressed under a motor vehicle. The cause of death was the rib and pelvic fractures and lung and liver lacerations caused by the compressive blunt force trauma from being run over by a motor vehicle.

To support his appeal, defendant has raised five issues. These issues will be considered in the order in which they appear in defendant's brief. Additional facts will be provided as necessary to deal with these issues.

I. **Whether the trial justice erred in imposing a sentence of life without parole when the indictment did not set forth factual allegations or a statutory reference sufficient to invoke a penalty of life imprisonment without parole.**

 The defendant argues that the trial justice had no authority to impose a sentence of life imprisonment without parole because the indictment returned by the grand jury did not allege a violation of the statute that authorizes the imposition of such penalty, namely, § 11–23–2 and the procedural provisions set forth in G.L.1956 chapter 19.2 of title 12. It is undisputed that defendant waived a jury trial in this case. It is undisputed that within twenty days after defendant's arraignment, the Attorney General, pursuant to § 12–19.2–1 et seq. gave notice of his intention to recommend an enhanced sentence of life imprisonment without parole.[1]

The defendant's argument is based by analogy on a series of cases decided by the Supreme Court of the United States in recent years. He relies first upon *Jones v. United States*, 526 U.S. 227, 119 S.Ct.

---

1. *"NOTICE BY THE ATTORNEY GENERAL OF A RECOMMENDATION OF A SENTENCE OF LIFE WITHOUT PAROLE PURSUANT TO R.I.G.L. 11–23–2(4) AND 12–19.2–1*

The State of Rhode Island, by and through its attorneys, Sheldon Whitehouse, Attorney General, J. Patrick Youngs, Assistant Attorney General, and Stacey P. Veroni, Special Assistant Attorney General, in the above entitled matter hereby serves notice upon the Court and the defendant that in the event the defendant is convicted of murder, the State recommends to the Court a sentence of life without parole pursuant to R.I.G.L. § 11–23–2(4).
 **STATE OF RHODE ISLAND**
 **SHELDON WHITEHOUSE**
 **ATTORNEY GENERAL"**

1215, 143 L.Ed.2d 311 (1999). In *Jones,* the defendant was charged with the use of a firearm while carjacking. The statute provided at that time for an enhanced punishment in the event serious injury or death resulted. The indictment did not refer to the factors that would justify an enhanced punishment, nor did the jury make any finding in respect to the factor of serious bodily injury. The District Judge at the time of sentencing, after the jury verdict, found that serious bodily injury to the victim had resulted and imposed an enhanced sentence. The Ninth Circuit affirmed. The Supreme Court of the United States reversed on certiorari and held that each of the subsections that authorized an enhanced sentence constituted separate offenses that had to be charged and proven in order to impose the long terms above the maximum, which the statute authorized without such additional facts. In this case, the Supreme Court used the technique of statutory interpretation to avoid declaring the statute unconstitutional.

The next case was *Castillo v. United States,* 530 U.S. 120, 120 S.Ct. 2090, 147 L.Ed.2d 94 (2000). This was a case involving a statute that prohibited using a firearm in relation to a crime of violence. The basic maximum penalty, pursuant to this statute, was five years in prison. However, the statute provided for a mandatory term of thirty years imprisonment if the weapon used was a machine gun. On the authority of *Jones,* the Supreme Court held that the machine-gun-based enhancement was not merely a sentencing factor but a separate offense that required a charge and submission of proof beyond a reasonable doubt to the jury to justify the enhanced penalty. *See Castillo,* 530 U.S. at 131, 120 S.Ct. at 2096, 147 L.Ed.2d at 103.

The third case upon which the defendant relies is *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), which was a state case involving the enhancement of a crime of unlawful possession of a firearm (which carried a maximum penalty of ten years) if the judge found in the sentencing proceeding that the defendant had been motivated by racial bias. The defendant had fired shots into the dwelling of an African–American family. He had been charged with unlawful possession of a firearm. He pled guilty to that charge. In sentencing, however, the judge found as a fact that he had been motivated by racial bias and imposed a sentence of twelve years. The Supreme Court of New Jersey affirmed. On certiorari, the United States Supreme Court again held, although the case arose from a state court, that whenever an additional set of circumstances would authorize the enhancement of punishment beyond the maximum provided in the basic statute, it would be necessary for the court to submit this question to a jury and prove the enhancement circumstances beyond a reasonable doubt. *See Id.* at 490, 120 S.Ct. at 2362–63, 147 L.Ed.2d at 455.

There seems to be no question that the cases of *Jones, Castillo* and *Apprendi* required that whenever a factor or circumstance is alleged, which justifies the enhancement of a penalty beyond the maximum set forth in a criminal statute, then this factor or circumstance must be submitted to the jury pursuant to the Sixth Amendment of the Constitution and found by the jury beyond a reasonable doubt to justify the imposition of additional penalties. Since the filing of the defendant's brief and the brief of the state, the Supreme Court of the United States has decided two additional cases that are significant in determining this issue.

The first was *Ring v. Arizona*, 536 U.S. ——, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).[2] (The opinion in this case was issued on June 24 of this year.) In that case, the defendant was found guilty of felony murder. The defendant had participated in an armed robbery of the contents of a Wells Fargo armored van in Glendale, Arizona. In the course of the robbery, the driver was killed by a gunshot wound to the head. Under Arizona law, the facts submitted to the jury dealt only with the commission of the crime of felony murder. An attempt to prove premeditated murder failed because of lack of testimony at trial on that issue.

The jury found Ring guilty of felony murder. However, under the Arizona death penalty statute, the existence of aggravating circumstances, which would justify the imposition of the death penalty, was required to be presented to the trial justice at the sentencing phase of the case. At this phase, an additional witness was presented who established that Ring had actually shot the victim and also that he had played a major role in planning and implementing the robbery. The judge found two aggravating factors. One, that the defendant committed the offense in expectation of the receipt of something of pecuniary value and two, that the defendant committed the offense in an especially heinous and depraved manner. On appeal, the Supreme Court of Arizona upheld the death sentence on the ground of the factor of pecuniary gain, but found the evidence insufficient to support the aggravating circumstance of depravement. *See State v. Ring*, 200 Ariz. 267, 25 P.3d 1139 (Ariz. 2001).

On certiorari, an opinion authored by Justice Ginsburg (joined by Justices Stevens, Scalia, Kennedy, Souter and Thomas) held that the determination of the existence of an aggravating factor that would justify the imposition of a death penalty required, as in noncapital cases, that a jury must find the existence of such aggravating factors beyond a reasonable doubt. *See Ring*, 536 U.S. at ——, 122 S.Ct. at 2443, 153 L.Ed.2d at 576–77. In *Ring,* the Supreme Court overruled its earlier decision in *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). In that case, the Court had held that the Arizona sentencing scheme was compatible with the Sixth Amendment because the additional factor found by the judge qualified as a sentencing consideration, not as an element of the offense of capital murder. *See Walton*, 497 U.S. at 649, 110 S.Ct. at 3055, 111 L.Ed.2d at 525. In *Ring*, the Court determined that *Walton* was not compatible with its decision in *Apprendi.*

■ For purposes of the case at bar, it should be noted that the defendant did not contend nor did the Court hold in *Ring* that the indictment was constitutionally defective because the Fourteenth Amendment has not been construed to include the Fifth Amendment right to presentment or indictment by a grand jury. *See Ring*, 536 U.S. at —— n. 4, 122 S.Ct. at 2437 n. 4, 153 L.Ed.2d at 569 n. 4; *Apprendi,* 530 U.S. at 477 n. 3, 120 S.Ct. at 2355 n. 3, 147 L.Ed.2d at 447 n. 3. It should also be noted that in *Hurtado v. California*, 110 U.S. 516, 538, 4 S.Ct. 111, 122, 28 L.Ed. 232, 239 (1884), the Supreme Court of the United States held that the requirement of a grand jury indictment set forth in the Fifth Amendment to the Constitution of the United States was not applicable to the states. In its long course of selective incorporation, the Supreme Court has never overruled *Hurtado.* Thus, as recognized in both *Apprendi* and *Ring*, there is no federal requirement that a felony prosecu-

---

2. The defendant discusses this case and other recent cases in his reply brief.

tion, capital or otherwise, be commenced by an indictment issued by a grand jury in a state prosecution.

The other case decided this term was *Harris v. United States,* 536 U.S. ——, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002), decided the same day as *Ring.* This case is not directly applicable to the case at bar but merely holds that it is unnecessary for a jury to determine the existence of a factor that would trigger mandatory minimum sentencing by virtue of an aggravating factor as long as the mandatory minimum is within the maximum authorized by the basic statute. *See Harris,* 536 U.S. at ——, 122 S.Ct. at 2414, 153 L.Ed.2d at 537–38. In *Harris,* the aggravating factors that triggered mandatory minimum sentences were brandishing (minimum of seven years) or discharging (minimum of ten years) a firearm (pursuant to a federal statute, 18 U.S.C. § 924(c)1(A)) which forbade the use or carrying of a firearm in furtherance of a crime. *Harris,* 536 U.S. at ——, 122 S.Ct. at 2414, 153 L.Ed.2d at 537–38. This case is of interest only because it established that a mandatory minimum sentence may be triggered by sentencing factors that may be found by a judge without the intervention of the jury. It might be noted that Justices Thomas, Stevens, Souter and Ginsburg dissented from this opinion.

Thus, the present state of the Supreme Law of the Land requires that a circumstance which enhances a sentence beyond the maximum authorized by the basic statute must be found to exist by a jury beyond a reasonable doubt. A circumstance which requires the imposition of a mandatory minimum sentence may be found by a a trial judge to exist by a fair preponderance of the evidence so long as it does not exceed the maximum authorized in the basic statute.

The Rhode Island statute authorizing the imposition of the penalty of life impris-

onment without parole requires the finding of one or more aggravating factors beyond a reasonable doubt by a petit jury unless a jury trial is waived, as was done in this case. *See* G.L.1956 § 12–19.2–1; *State v. Travis,* 568 A.2d 316, 323–24 (R.I.1990).

By waiving a jury, defendant accepted the procedure as followed in this case, that the trial justice, after finding him guilty of the offense of first-degree domestic murder, would proceed to find, as she did, that the aggravating circumstance of torture and aggravated battery had been proven beyond a reasonable doubt. There is no settled constitutional requirement that the aggravating factor set forth in § 11–23–2 be set forth in the grand jury indictment. It is true that in *State v. Lassor,* 555 A.2d 339 (R.I.1989) the indictment cited the penalty statute § 11–23–2 as well as the substantive murder statute § 11–23–1. However, in the case at bar, the Attorney General complied with § 12–19.2–1 in providing notice within twenty days of the arraignment that the sentence of life imprisonment without parole would be requested.

In our opinion, this notice satisfied the element of due process required, pursuant to the Constitution of Rhode Island. To suggest that the inclusion of a statutory reference to § 11–23–2 in the indictment would give defendant more effective notice is totally unpersuasive. It is equally unpersuasive to suggest that a grand jury would have declined to issue an indictment had reference to § 11–23–2 been set forth therein. Consequently, we respectfully reject defendant's argument in support of this issue.

## II. Whether the trial justice erred in rejecting defendant's diminished capacity defense

■ The defendant argues that the trial justice erred in rejecting his contention

that the state failed to prove beyond a reasonable doubt that he was not suffering from diminished capacity brought about by intoxication or a state of disinhibition caused by ingestion of an anti-anxiety drug called Klonopin. Certainly, Rhode Island recognizes the defense of diminished capacity that may reduce a crime from murder to manslaughter if defendant is unable to form a specific intent. *See State v. Hockenhull*, 525 A.2d 926, 929 (R.I.1987).

The standard for the defense of diminished capacity was authoritatively stated many years ago in *State v. Vanasse*, 42 R.I. 278, 107 A. 85 (1919). In that case, which involved a charge of assault with intent to commit rape, the defendant asserted that he was entitled to an instruction concerning diminished capacity by reason of voluntary intoxication. The Court held that diminished capacity could reduce the charge only "when the respondent's intoxication is so complete that he has become entirely incapable of forming the design with which he is charged." *Id.* at 281, 107 A. at 86. The Court went on to comment that:

> "When a particular intent is charged which aggravates the offense actually committed and enlarges it into a greater offense, as in the case under consideration the assault is alleged to have been made with intent to commit rape, then drunkenness is no excuse for the assault, but it may be offered to [negate] the specific intent charged, but only when the drunkenness is of such a degree as to completely paralyze the will of the respondent, take from him the power to withstand evil impulses and render his mind incapable of forming any sane design." *Id.*

In *Hockenhull*, 525 A.2d at 930, we applied the doctrine of diminished capacity to a situation in which the defendant produced evidence that created a reasonable possibility that his will was sufficiently paralyzed, and his capability so diminished by drugs and alcohol, that it was questionable that he could have formed any sane design or intent in carrying out the killing. Therefore we held that the trial justice should have instructed the jury on manslaughter by reason of diminished capacity. *Id.* at 931. *See also State v. Amazeen*, 526 A.2d 1268, 1272 (R.I.1987) (concluding that the defendant was "not entitled to a charge on a lesser degree of homicide" because "no rational jury could have found that defendant was acting with a will so paralyzed and a capacity so diminished by alcohol to have precluded him from forming any sane design or specific intent in carrying out his killing").

In the case at bar, defendant testified that he had ingested a large quantity of Klonopin while attending the wedding of the victim's daughter. It should be noted that defendant, in his various statements, was inconsistent concerning the timing of this ingestion and the amount thereof. The defendant presented two expert witnesses on this issue, Dr. Michael Ingall (Dr. Ingall) and Dr. Robert Swift (Dr. Swift). Doctor Ingall formed his opinion in reliance upon facts given to him in an interview with defendant. Doctor Swift, who was an expert in pharmacology and psychiatry, did not interview defendant, but assumed that defendant took twenty-five Klonopin tablets over several hours on the day of the wedding. Doctor Ingall assumed that he took the last twelve Klonopin tablets before the killing. The trial justice pointed out in her decision that neither Dr. Swift nor Dr. Ingall could opine with any certainty the amount or "timing of that ingestion." In her extensive and detailed analysis of the evidence on this issue, the trial justice summarized her opinion by stating:

"I do not believe the defendant's woven tale of klonopin ingestion. I believe that any klonopin he took that day was taken immediately before or just after the crime. I do not assign any weight to any of the other corroborative evidence marshaled in his favor. I do not accept his testimony that he lacked thoughts during the crime and memories thereafter. Absent such credible evidence, his defense of diminished capacity is built on sand. Through the sheer incredulity of his testimony, he has eliminated voluntary klonopin intoxication as a defense to murder. On the state of this evidence, no rational finder of fact could find that the defendant had a capacity so diminished by klonopin as to preclude him from premeditating or forming an intent to kill.

" * * *

"It is my judgment, beyond a reasonable doubt, based on the persuasive opinion testimony of Dr. Wall, [the state's expert witness] that the defendant's level of klonopin intoxication (if any), together with his psychiatric conditions (anxiety disorder/personality disorder) did not paralyze his will, take from him the power to withstand evil impulses or render his mind incapable of forming a sane design. He had no black-outs or loss of memory. He planned his actions with the ring, the sequence of assaults and the bridge. He knew what he did was wrong, as evidenced by his statements to his sisters, the police and Newport Hospital personnel. He knew what he was doing at the time: assaulting Jeanne in increasing stages of severity until she died, simply because she would not shut up. Klonopin did not render him incapable of premeditating and forming an intent; he had those capabilities and he exercised them."

The trial justice, in analyzing the context of testimony, commented in her decision

"The testimony of Nurse Aubin, Detective Rosa, and the defendant's sisters as to the defendant's statements in the minutes and hours immediately following his killing of Jeanne Robinson were very credible. They flatly contradicted his trial testimony that he had no thoughts while he was hurting Jeanne, nor ability to plan his behavior, and no recollection of what happened after Jeanne was in his arms. They show that he intended to kill Jeanne and that he knew not only that he killed Jeanne but how he killed her."

The state's expert, Dr. Barry Wall (Dr. Wall), together with Dr. William Brennan, evaluated the defendant for competency, and then later further evaluated him on the issue of diminished capacity. Doctor Wall stated unequivocally that defendant was not incapable of forming a sane design. It is noteworthy that Dr. Ingall also testified that defendant did not meet the *Vanasse* standard of diminished capacity. However, he argued that the *Vanasse* standard was impossible to meet unless a person was virtually comatose. *Vanasse*, 42 R.I. at 281, 107 A. at 86. The defendant argues that we should reconsider and reject the *Vanasse* standard, which was formulated more than eighty years ago. A case should not be rejected merely because of its age. Many cases become even more authoritative because they have withstood the test of time. *See, e.g., Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed 60 (1803).

We recognize that scientific knowledge may render a mental test obsolescent, *see State v. Johnson*, 121 R.I. 254, 267–68, 399 A.2d 469, 476–77 (1979), wherein this Court adopted an insanity test based upon the model penal code in substitution for

the *M'Naghton* Rule promulgated by the British House of Lords in the middle of the 19th century.

We do not believe that this case would be appropriate for a reexamination of the standard set forth in *Vanasse.* In light of the trial justice's finding that defendant's testimony was incredible and that his diminished capacity defense was "based on sand," we do not come even close to a situation wherein a different rule would change the result. The trial justice's findings of fact indicate that at no time before the murder was defendant significantly intoxicated. She expressed the factual opinion that much of his ingestion occurred after the murder when he was on his way to the Newport Bridge. Even at the bridge, the observations of Det. Rosa did not indicate any significant level of intoxication that would disable defendant from forming a specific intent. Indeed, he demonstrated the mental acuity and physical agility to climb onto the I-beam projecting out from the bridge high above the waters of Narragansett Bay.

■ The findings of fact of a trial justice are reviewed with deference. *See State v. Gasparico,* 694 A.2d 1204, 1208 (R.I.1997); *State v. Traficante,* 636 A.2d 692, 694 (R.I.1994). The findings of the trial justice should not be disturbed unless it is shown that he or she overlooked or misconceived material evidence or was otherwise clearly wrong. *See State v. Collins,* 679 A.2d 862, 865 (R.I.1996); *Traficante,* 636 A.2d at 694. Our review of the evidence in this case and the detailed decision of the trial justice on this issue clearly indicates that she was not only not clearly wrong but that she was completely correct in her factual findings. She did not overlook any portion of the relevant and material evidence on this issue. Indeed, she analyzed this evidence in exhaustive detail.

Consequently, we reject defendant's argument that the trial justice erred in finding beyond a reasonable doubt that his capacity to form a specific intent was not lacking to the required degree to establish a reduction of his offense from murder to manslaughter.

### III. Intoxication as a Mitigating Factor

■ The defendant argues that the trial justice erred in not giving effect to his intoxication as a result of his ingestion of Klonopin as a mitigating factor. He asserts that even if the level of intoxication was not sufficient to meet the *Vanasse* standard for the diminished-capacity defense, it should have been weighed in considering whether to impose the penalty of life imprisonment without parole.

The difficulty with defendant's argument is that the record discloses clearly that the trial justice did consider the element of intoxication. She commented extensively on the allegation of intoxication from Klonopin, but after detailed analysis, she rejected this element as a mitigating factor. In the course of her sentencing proceeding, she described the horrendous acts of escalating violence, which had been described by defendant himself in the course of the trial. She described the act of strangling, followed by the beating with the flashlight, and then the ultimate use of the automobile to crush the life from Jeanne's body. She then commented further:

"Self-pity then set in and you became overwhelmed not by your brutal acts of violent killing, but of what would happen to you next. You feared going to the Adult Correctional Institutions. You contemplated suicide—your ultimate act of selfishness. But you were too coward[ly] to end your life.

"You chose instead to assign responsibility for Jeanne's death to other persons and other things, instead of taking responsibility for your own actions. You have blamed Jeanne for her own death, suggesting that if she had respected your feelings about not wanting to meet her past family, her murder never would have occurred. You have blamed drugs. You wanted me to believe that it was Klonopin that made you do it. Your testimony regarding Klonopin ingestion and your memories surrounding the murder were, in my judgment, patently false. You have not been truthful about your drug and alcohol ingestion or the circumstances regarding the commission of your crime with your family, Jeanne's family, your doctors, this Court, or yourself. Your testimony about the murder was a far cry from the truth, the whole truth and nothing but the truth."

It is extremely significant that the testimony from defendant's expert witnesses, as well as the testimony of Dr. Wall for the state, all were dependent upon facts given to the doctors by defendant. There was no way to tell how many Klonopin tablets he had ingested before the murder, as opposed to those he ingested after the murder. In short, the evidence relating to his ingestion largely depended on the credibility of defendant's own testimony. The trial justice commented upon this credibility once more.

"The Court finds no evidence to support your claim, Mr. Edwards, that you ingested drugs and that such ingestion played a role in your act of murder and thus should be considered a mitigating factor in sentencing. This Court did not accept your trial testimony regarding Klonopin ingestion as connected to your brutal acts and thus, does not accept your ingestion of Klonopin by you today as a mitigating factor, in sentencing you for murder. Indeed, far from being a mitigating factor, your lack of truthfulness regarding Klonopin ingestion and your memory of the crime and your attempt to blame the crime on that drug, rather than accepting responsibility yourself, are considered aggravating factors by the Court that are so significant as to thwart the possibility of any future meaningful rehabilitation."

In determining that there was no evidence to support defendant's claim, the trial justice was not negating the testimony of Dr. Wall or even the testimony of defendant's expert witnesses. She stated that defendant's own testimony about the timing and amount of his ingestion of Klonopin was completely lacking in credibility. She had made similar statements in passing upon the claim of diminished capacity. It cannot be overemphasized that the testimony of the expert witnesses in each instance depended on statements that defendant gave to the experts.

The only time at which the trial justice determined that defendant may have been intoxicated was upon his arrival at the Cranston police station, when she found that it was not entirely clear that he was able to understand and appreciate the *Miranda* admonitions. This occurred approximately ten hours after defendant had been encountered on the Newport Bridge and nearly eleven hours after the homicide was committed. The defendant himself admitted ingesting a number of Klonopin tablets during his ride from Cranston to the Newport Bridge. Doctor Wall's testimony, which depended largely on information defendant gave to him in the course of several interviews, was extremely tentative concerning defendant's level of intoxication at the time the homicide was committed. He was definite only on the opinion that whatever level of intoxication defendant had when he committed the acts relating

to the victim's death, it did not meet the legal standard for diminished capacity. He did not, of course, comment on whether defendant's state of intoxication should be considered as a mitigating factor, since his testimony did not purport to be relevant to that issue.

In our opinion, the trial justice carefully considered the factors of torture and aggravated battery leading to the victim's death. She considered all the mitigating factors, including defendant's age, his having no prior criminal record, his gainful employment, his family relationships, as well as his claim of intoxication. She expressed the considered opinion that the aggravating factor outweighed the mitigating factors. She rejected the claim of intoxication as a significant mitigating factor. Our analysis of the record causes us to conclude that the trial justice was correct in her findings. We reject defendant's contention that she erred in her refusal to accept the factor of intoxication in mitigation of the offense to preclude a sentence of life imprisonment without parole. We agree with the trial justice that this sentence was warranted and met all the statutory standards of the commission of murder in the first degree, with the aggravating factor that it was "committed in a manner involving torture or an aggravated battery to the victim." In the exercise of our independent judgment, we affirm the sentence of life imprisonment without parole.

### IV. The motion to suppress statements made on the Newport Bridge and at Newport Hospital

■ The defendant argues that statements he made to Det. Rosa and Trooper Simon Liu (Trooper Liu) on the Newport Bridge should have been suppressed because the defendant was in an intoxicated state at the time he made those state-

ments. The defendant also argues that statements he made to Nurse Aubin at the emergency room of the Newport Hospital should have been suppressed. He argues that if he was sufficiently intoxicated when interrogated by the Cranston police to warrant suppression of statements while in their custody, the same exclusionary rule should be applied to statements he made earlier on the Newport Bridge and to Nurse Aubin.

This argument must be considered in light of the unequivocal finding by the trial justice by clear and convincing evidence that the statements to Det. Rosa and Trooper Liu were "spontaneous statements that were not the result of police questioning." She further found that defendant was not in custody while he balanced himself on the I-beam at the bridge, and that the officers did not interrogate him at that time. Those findings of fact, of course, are entitled to deferential review because they are matters of historical fact. They were strongly supported by the surrounding evidence. At the time the officers encountered defendant precariously balanced on the I-beam, he was clearly threatening to commit suicide. The officers' motivation was to dissuade him from the act of self destruction, not to interrogate him. Certainly, he was not in police custody. The only tool that the police could exercise was persuasion to prevent defendant from carrying out his threat of suicide.

■ As a matter of law, the exclusionary rule of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) does not come into play unless it is triggered by two factors: (1) custody, and (2) interrogation. Our comments in *State v. Caruolo,* 524 A.2d 575 (R.I.1987) are applicable equally to the case at bar.

"By its own terms the rule applies only when interrogation occurs within the co-

ercive atmosphere of police custody. *Id.* at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 707; *see Minnesota v. Murphy,* 465 U.S. 420, 430, 104 S.Ct. 1136, 1144, 79 L.Ed.2d 409, 421 (1984) (*Miranda* warnings inapplicable to questioning in non-custodial settings); *Beckwith v. United States,* 425 U.S. 341, 346, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1, 7 (1976) (custodial nature of interrogation triggers need for *Miranda* warnings). Although a certain degree of coerciveness inheres in any police interrogation of a person suspected of a crime simply because of the aura of authority surrounding the interrogating officer, custody as contemplated by *Miranda* does not exist merely because the interrogation occurs at a police station or because the interrogated person is suspected of a crime or is the focus of a police investigation. *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977); *Beckwith,* 425 U.S. at 347, 96 S.Ct. at 1616, 48 L.Ed.2d at 8. Nor does it necessarily exist when the interrogating officer consciously seeks incriminating evidence. *Murphy,* 465 U.S. at 428, 431, 104 S.Ct. at 1142, 1144, 79 L.Ed.2d at 419, 422. Rather the decisive test for determining whether a person is in custody for purposes of receiving *Miranda* warnings is whether the person is formally arrested or whether the person's freedom of movement is restricted to the degree associated with formal arrest. *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3519, 77 L.Ed.2d 1275, 1279 (1983). Absent a formal arrest the determination of whether a person is subjected to restraints comparable to those associated with a formal arrest turns on how a reasonable person in the suspect's position would understand the *situation. Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3152, 82 L.Ed.2d 317, 336 (1984)." *Caruolo,* 524 A.2d at 579.

In many of the cases cited in *Caruolo,* one of the elements was present, such as interrogation in *Mathiason* and *Murphy.* In this case, on the Newport Bridge, neither the element of custody nor interrogation was present and, therefore, the exclusionary rule clearly did not apply.

The defendant's statements to Nurse Aubin were not elicited by any police interrogation. They were spontaneous utterances made to her. Although defendant was under restraint at the Newport Hospital, the restraint was not related to a criminal charge, but only to prevent his committing an act harmful to himself.

The defendant argues that even in the absence of interrogation in custody, his statements on the bridge and at the hospital should be excluded because of his alleged intoxication. This argument cannot survive the holding of the Supreme Court of the United States in *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). In *Connelly,* the suspect was mentally unbalanced. He approached a Denver Police officer and said that he wanted to confess to committing a murder. He was advised of his *Miranda* rights, and said that he understood them. At police headquarters, he confessed to the murder in detail and pointed out the location of the murder. After being held overnight, he was interviewed the following day by the public defender. During the course of the interview, he became visibly disoriented. Subsequently, a psychiatrist examined him at the state hospital and expressed the opinion that the defendant had confessed because he believed that "the voice of God" directed him to admit his crime. The psychiatrist testified that defendant's psychosis had motivated his confession. Based on the psychiatrist's testimony, the trial court suppressed the defendant's statements, finding that they were made involuntarily. The Colorado

Supreme Court affirmed, holding that the absence of police coercion or duress did not foreclose a finding of involuntariness. *Colorado v. Connelly,* 702 P.2d 722, 729 (Colo.1985).

On certiorari, in an opinion written by Chief Justice Rehnquist, the Supreme Court of the United States reversed the judgment of the Supreme Court of Colorado, holding that the defendant's mental condition was not in and of itself sufficient to base a finding that his confession was not voluntary. *See Connelly,* 479 U.S. at 164, 107 S.Ct. at 520, 93 L.Ed.2d at 482. The majority stated that coercive government conduct was a necessary prerequisite to a finding that a confession was not voluntary within the meaning of the Due Process Clause of the Federal Constitution. *See id.* at 167, 107 S.Ct. at 522, 93 L.Ed.2d at 484. Chief Justice Rehnquist commented that *Miranda* protects only against government coercion, not coercion flowing from the "voice of God." *See id.* at 170–71, 107 S.Ct. at 523–24, 93 L.Ed.2d at 487. Justice Stevens, who concurred in the judgment and dissented in part, agreed that the defendant's pre-custodial statements were admissible. *See id.* at 171–72, 107 S.Ct. at 524, 93 L.Ed.2d at 487 (Stevens, J., concurring in part and dissenting in part). They were in fact involuntary, he stated, but nevertheless admissible since they were not obtained in violation of the Fifth Amendment. *See id.* at 172, 107 S.Ct. at 524, 93 L.Ed.2d at 487–88. Only Justices Brennan and Marshall dissented from the court's judgment based upon the asserted unreliability of statements made by the mentally ill. *See id.* at 188, 107 S.Ct. at 533, 93 L.Ed.2d at 498 (Brennan, J., dissenting).

The holding in *Connelly* arguably might have supported the admission of statements made to the Cranston police. It clearly and unequivocally supports the admission of the spontaneous utterances made without interrogation to Det. Rosa and Trooper Liu on the Newport Bridge, and to Nurse Aubin at the Newport Hospital. We decline to accept defendant's argument on this issue.

## V. The rebuttal testimony of defendant's former wife

■ The defendant contends that the trial justice erred in receiving rebuttal testimony from Susanne Murray, his former wife, relating to episodes of violence on his part, some of which had taken place while he had been intoxicated, and some occurred without the ingestion of alcohol.

The entire theory of Edwards's defense was based upon the contention that the commission of his brutal acts upon the person of Jeanne occurred as a result of his disinhibition while intoxicated under the influence of Klonopin. The inference, which he sought to have the trier of fact draw from his testimony and that of his expert witnesses was to the effect that he would not have committed this crime if he had not been under the influence of an intoxicant.

When the prosecutor cross-examined Edwards in relation to his conduct concerning Susanne Murray, he sought to raise an issue relating to his propensity for violence. It is generally true that prior bad acts on the part of a defendant are not admissible to show that he has a propensity to commit the type of crime with which he is charged. *See* Rule 404(b) of the Rhode Island Rules of Evidence. However, in the case at bar, defendant had placed his character in issue by contending that intoxication had diminished his ability to commit an intentional homicide. *See McCormick's Handbook of the Law of Evidence,* § 191 (2d ed. Cleary 1972). Even defendant concedes that evidence of prior violence could be used to impeach his testi-

mony. In this case, there was never any factual dispute concerning defendant's physical actions. The testimony of Susanne Murray was not used to prove that defendant performed the physical acts that resulted in Jeanne's death. It was used only to rebut Edwards' defense of diminished capacity and concomitant suggestion that he would have been unlikely to commit such acts unless he was under the influence of an intoxicant such as Klonopin or alcohol. This was an issue that was not invented by the prosecution or manufactured in the course of cross-examination, as was the case in *State v. O'Dell,* 576 A.2d 425, 429 (R.I.1990).

One of the specific exceptions in Rule 404(b) is that evidence of prior bad acts may be admissible if other purposes, such as "proof of motive, opportunity, *intent*", are the objectives of the evidence. If the defendant presents himself as a nonviolent individual, the state may rebut this image by presenting evidence to the contrary. The remoteness in time of such acts might well affect the weight to be given to the evidence but would not cause it to be inadmissible. In our opinion, this evidence was relevant on the issue of intent. "[E]vidence of prior criminal acts [or bad acts] are inadmissible only if that evidence is both prejudicial and irrelevant." *State v. Martinez,* 651 A.2d 1189, 1194 (R.I.1994).

In this nonjury trial the risk of undue prejudice under Rule 403 of the Rhode Island Rules of Evidence was minimal. The determination of relevance by the trial justice did not constitute an abuse of discretion. *See State v. Gabriau,* 696 A.2d 290, 294 (R.I.1997). This evidence was properly admitted on the issue of the defendant's ability to form a violent intent with or without the influence of intoxication. The trial justice did not err. No prejudicial error was committed in admitting the challenged testimony.

## Conclusion

For the reasons stated, the appeal of the defendant is denied and dismissed. The judgment of conviction and the sentence imposed in the Superior Court are hereby affirmed. The papers in the case may be remanded to the Superior Court.